**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Clifton Gene GIBBONS,
Defendant-Appellant.**

**No. 77–1965.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 25, 1979.

Decided Sept. 11, 1979.

Charles Lee Waters, Asst. U. S. Atty., Oklahoma City, Okl. (Larry D. Patton, U. S. Atty., Oklahoma City, Okl., on brief), for plaintiff-appellee.

Charles F. Cox, Jr., of Cox & Barr, Norman, Okl., for defendant-appellant.

Before SETH, Chief Judge, and HOLLOWAY and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

This is a direct appeal by the defendant-appellant Clifton Gene Gibbons from his jury conviction on one count of a two-count indictment charging Gibbons and James Michael Hoover with conspiracy to commit offenses defined in 21 U.S.C. Sec. 841(a)(1) [1] and with possession of a controlled substance, methaqualone, with intent to distribute in violation of 21 U.S.C. Sec. 841(a)(1). Appellant Gibbons was acquitted by the jury on the conspiracy count and was convicted on the substantive count. He was sentenced to a term of five (5) years to be followed by a three (3) year special parole term.

Prior to trial defendant Hoover entered a plea of guilty to the conspiracy count pursuant to a plea bargain agreement negotiated with the United States Attorney's office. As part of that agreement Hoover testified at Gibbons' trial. In return, the United States Attorney agreed to drop the substantive count and not to file bail jumping charges against him. At the time of Gibbons' trial Hoover had not been sentenced.

Appellant's basic contentions on appeal are that the trial court erred in: (1) admitting in evidence a number of quaalude pills over a timely objection in violation of his Fourth Amendment rights; (2) admitting testimony at trial from a witness called before a grand jury after an indictment had been returned against defendant, the grand jury proceedings being improperly used to freeze and to discover testimony; (3) denying a motion to dismiss, the evidence being insufficient to support the conviction; and (4) refusing to grant his motion to dismiss and discharge the jury panel due to prejudicial comments made by a prospective juror during voir dire examination.

### I. The Facts

Viewing all the evidence, together with all reasonable inferences therefrom, in the light most favorable to the government as we must on this appeal from a guilty verdict, *United States v. Twilligear*, 460 F.2d 79, 80–81 (10th Cir.), the evidence tended to show the following facts:

Controlled substances are regulated by the Attorney General under the authority vested in him by 21 U.S.C. Secs. 811–12. They include the substance involved in this case—methaqualone. *See* 21 U.S.C. Sec. 812 and 21 C.F.R. Sec. 1308.12(e).

---

1.  21 U.S.C. Sec. 841(a)(1) provides:

    Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance
    . . . .

In the late evening on Saturday, May 14, 1977, an unnamed man delivered a black trunk to the American Airlines' airfreight office in Phoenix, Arizona. Although the trunk was in a dilapidated condition American Airlines' employee Charles Guilfoyle accepted it for shipment to Oklahoma City because it would be transported on a direct flight and would therefore require little handling. The airbill authorizing the shipment, which was filled out by the unnamed individual, indicated that the trunk contained books and personal effects and was to be shipped to a Michael Hoover in Oklahoma City. II R. 75. Guilfoyle found the cargo unusual because the "beat up" trunk was locked by a "very brand new and high security lock." Moreover, his suspicion was aroused further when he recognized that the return address listed on the airbill was to a parking lot of a local high school. II R. 72.

After the shipper had left the freight office Guilfoyle attempted to move the trunk to another location for shipment. Upon standing the trunk up on its end, a small tinfoil packet of pills fell out of a crack in the bottom seam of the trunk.[2] Written on the packet was the word "Quaalude." Peering into the crack of the trunk Guilfoyle saw "nothing but quaaludes—or the pills, the packets of pills all the way through the whole trunk." This revelation, coupled with his earlier suspicion, caused him to contact his superior who subsequently notified the Phoenix Police Department. II R. 73–74.

Shortly after the Phoenix Police were called in, narcotics detective John Dee began an investigation. Upon his arrival at the freight office, Dee was filled in on the details by Guilfoyle and was given the small tinfoil packet which had dropped out of the trunk. He apparently recognized the pills as being a controlled drug. II R. 74. After "looking through the crack" of the trunk

and seeing a number of "tinfoil packets similar to the one . . . [he] had been handed," Dee seized the trunk and tinfoil packet along with a copy of the airbill and took them to the police station. II R. 86–87. After obtaining an Arizona search warrant (I R. 97–103) early Sunday morning, May 15, Dee opened the trunk by removing the rear panel hinge guards and hinge pins. This procedure was used so as not to disturb the lock and to prevent alerting the parties to the Government's involvement. In the trunk, along with various other items, Dee found three brown paper bags filled with approximately 23,000 pills wrapped in tinfoil packets, with 10 pills to a packet. II R. 92–93.[3] These pills were identified at trial by two forensic chemists as containing methaqualone. II R. 135, 137, 152.[4]

Shortly after opening the trunk Dee telephoned the Oklahoma City Police Department and spoke with detective Ray Clark. Dee informed Clark of the discovery of the drug shipment bound for Oklahoma City. The detectives agreed upon a plan whereby Dee would select, mark and send to Oklahoma City a random sample of the quaalude found in the trunk. The remainder would be retained in the custody of the Phoenix police pending trial. Dee packed the random sample along with a copy of the Arizona search warrant into the trunk, resealed it, returned it to the airport and watched it loaded onto the originally scheduled flight to Oklahoma City. Meanwhile, on the basis of the phone conversation with Dee and a follow-up teletype message containing identical information, detective Clark executed an affidavit and obtained an Oklahoma search warrant (I R. 104) for the trunk. II R. 103.

When the flight from Phoenix arrived at Oklahoma City detective Clark personally witnessed the trunk being unloaded and carried to a storage area where surveillance had been set up. Shortly thereafter Mi-

---

2. The packet of pills was described at a suppression hearing as a strip approximately seven to eight inches long, with two pills parallel and five rows. I Supp. R. 13–14.

3. Other items were found in the trunk such as clothing, a notebook, toothbrush, pen, hand cal-

culator and a pair of woman's socks. The last item was connected at trial to the appellant and his wife. II R. 94–97, 165–66, 305.

4. Methaqualone is commonly referred to by its commercial name "Quaalude." II R. 151.

chael Hoover, the addressee, and the appellant came and claimed the trunk. When Clark and two other police officers approached the two men, Hoover was unlocking the back door of a camper-covered pickup truck while appellant, who had the trunk in his hands, was waiting to place it inside the camper. Both men were arrested and were served with the Oklahoma search warrant. One of the keys taken from Hoover's possession opened the heavy duty lock on the trunk. Inside were the Arizona search warrant and the random sample of drugs shipped by detective Dee. II R. 107–08, 119–20.

We turn to defendant's Fourth Amendment claim.

## II. *The Fourth Amendment Claims*

Prior to trial the appellant moved to suppress the evidence found in the trunk on the ground that it had been obtained in violation of his Fourth Amendment rights. I R. 19. The trial court overruled this motion at the pre-trial hearing, I Supp. R. 40, and subsequently admitted this evidence at trial over a timely objection.[5]

Appellant's Fourth Amendment claim has three branches. First, he says that the initial actions and investigation by the American Airlines' employee Guilfoyle, when the trunk was presented for shipment, amounted to a warrantless search. Consequently, the search warrants which were issued as a result of the information derived from that search were fatally tainted as the fruit of an illegal search. Second, he contends that the search warrants and supporting affidavits failed to contain any "positive averments" showing the need for a nighttime search. Finally, he argues that the search warrants lacked probable cause for their issuance. Brief of Appellant at 7–9.

---

5. The trial court permitted a continuing objection to the admission into evidence of "all quaalude." II R. 78–79, 93. Appellant's pretrial suppression motion sought to prevent admission at trial of all "evidence found as a result of a search instituted pursuant to search warrants . . . ." I R. 19. At trial the appellant sought to prevent the admission of "any contraband" derived from an illegal search. II R. 78.

## a. *Search by the airline employee*

█ It is fundamental that before the Fourth Amendment can be implicated there must be governmental action involved. *Burdeau v. McDowell*, 256 U.S. 465, 474, 41 S.Ct. 574, 65 L.Ed. 1048. Information derived from a search by a private person who is not acting in collusion with or at the behest of Government officials is not subject to Fourth Amendment strictures. *See United States v. Ford*, 525 F.2d 1308, 1311–12 (10th Cir.); *see generally* annot., 36 A.L. R.3d 553 (1971). Clearly, such information can be used in obtaining a search warrant without fatally tainting subsequent governmental action.

█ Appellant relies on *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) to support his theory that the airline employee's visual intrusion into the interior of the trunk constituted a search within the meaning of the Fourth Amendment. The issue in *Chadwick* was whether a search warrant was required before federal agents could open a locked footlocker which they had lawfully seized at the time of the arrest of its owners, when there was probable cause to believe the footlocker contained contraband. *Id.* at 3, 97 S.Ct. 2476. In holding that a warrant was necessary the Court noted several times that the fundamental purpose of the Fourth Amendment is to protect people from unreasonable governmental invasions into their legitimate expectations of privacy. *Id.* at 7, 11, 97 S.Ct. 2476. Nowhere in that opinion is there an indication that private action is circumscribed by Fourth Amendment limitations.

Appellant does not contend, nor is there sufficient evidence on the record to support a claim,[6] that the airline employee was act-

---

6. In passing on the correctness of the trial court's denial of a motion to suppress, this Court is not limited to considering only the evidence introduced at the suppression hearing. We may also consider any evidence properly presented at trial, even though that evidence might not have been introduced at the pretrial hearing. *United States v. Smith*, 527 F.2d 692, 694 (10th Cir.).

ing in concert with Government officials when he made his initial discovery of drugs in the trunk.[7] Consequently we hold that the initial actions of the airline employee were not a search within the meaning of the Fourth Amendment. Therefore there is no room for a claim that the information derived from the private investigation, when used to support the issuance of the search warrant, tainted the subsequent Government action.

### b. Sufficiency of the affidavit and warrant

Appellant's alternative Fourth Amendment arguments relate to the sufficiency of the affidavits and thus the validity of the warrants, in showing: (1) the need for a nighttime search and (2) probable cause for the issuance of the warrants. Appellant directs part of his argument at the Oklahoma process. However, we are only concerned with the validity of the Arizona warrant and the sufficiency of its underlying affidavits. *See United States v. Ford,* 525 F.2d 1308, 1312–13 (10th Cir.).[8]

In deciding the validity of the Arizona warrant and the underlying affidavits we must consider some preliminary questions. This Arizona warrant was issued by an Arizona judge, on an Arizona form, on application of an Arizona narcotics agent. In addition it was returnable to the issuing state judge. Moreover, the search which occurred was by an Arizona police officer. Federal agents did not instigate or assist in obtaining the state warrant and were not present during the search. Thus the warrant as issued and the search as executed were state in character. In such circumstances the warrant and affidavits need only conform to federal constitutional requirements in order for the resulting evidence to be admissible in a federal prosecution. *United States v. Millar,* 543 F.2d 1280, 1283–84 (10th Cir.); *United States v. Bedford,* 519 F.2d 650, 654 & n.1 (3d Cir.), cert. denied, 424 U.S. 917, 96 S.Ct. 1120, 47 L.Ed.2d 323; *see also On Lee v. United States,* 343 U.S. 747, 754–55, 72 S.Ct. 967, 96 L.Ed. 1270 (violation of state law, even if shown, would not render evidence obtained inadmissible in federal courts).[9]

7. Even if evidence of Government involvement existed, the initial discovery of the packet of drugs and the visual intrusion into the trunk by the airline employee would seem to fall within the ambit of the plain view doctrine. *See Harris v. United States,* 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067; *Ker v. California,* 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726.

8. In *Ford,* a case in which the material facts are practically indistinguishable from the instant case, the court did state that illegality in either the state of original or final seizure would be fatal. *Id.* at 1310. However, we noted that it was unrealistic to suggest that two separate police seizures occurred when the contraband was allowed to be shipped under close surveillance into another jurisdiction for purposes of apprehending other parties. We held that the defendant's Fourth Amendment claim must be judged as of the time and place of the initial police seizure. *Id.* at 1312–13. We find this analysis dispositive here and hold that a second warrant was not required before the Oklahoma City police could reassert actual physical control over the contraband. *See also United States v. DeBerry,* 487 F.2d 448, 450–51 (2d Cir.)

9. As our *Millar* opinion points out, 543 F.2d at 284, even if a search is made pursuant to a state warrant, if the search is "federal in character" then the legality of the search would be conditioned on a finding that the warrant satis-

fied federal constitutional requirements and certain provisions of Rule 41 "designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *United States v. Sellers,* 483 F.2d 37, 43 (5th Cir.), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212.

It is also significant, for purposes of determining whether a warrant is state or federal in origin, that the warrant was issued for a violation of state, not federal law. In this case the Arizona judge indicated on the warrant that the offense which had occurred was the "transportation of a Schedule II Drug—quaalude." I R. 98. While no state statute was cited, we note that Arizona has passed the Uniform Narcotic Drug Act which prohibits the transportation of narcotic drugs. *See* Ariz.Rev.Stat. Sec. 36–1002.02 (Supp.1979). In that uniform act, narcotic drug is defined to include "any other drug of natural or synthetic origin that may be classified as a narcotic by the federal narcotics commissioner . . . ." *See* Ariz.Rev.Stat. Sec. 36–1001(14) (Supp.1979). Methaqualone has been designated as a Schedule II controlled substance. See 21 C.F.R. Sec. 1308.12(e) (1977).

Since the search here was a state operation concerning possible violation of state law, the federal statute dealing with searches for narcotics, 21 U.S.C. Sec. 879(a), with its less restrictive provision for nighttime searches, is not applicable as it was in *Gooding v. United*

■ We turn to the questions raised concerning the warrant and the affidavit before us to determine whether they are defective because of the claimed failure to justify the nighttime search and to show probable cause for issuance of the Arizona warrant.

### The nighttime search problem

In a large number of jurisdictions statutes or court rules restrict the execution of search warrants to daytime hours, absent special circumstances showing the need for a nighttime search.[10] While there has been a considerable amount of litigation concerning the meaning of these provisions,[11] little attention has been focused on the constitutional limitations upon nighttime searches flowing from the Fourth Amendment.

The language of the Fourth Amendment explicitly sets out the requirements for a valid warrant.[12] There is, however, no specific provision on the time of day during which the warrant must be executed. Nevertheless, the provision must be "construed in the light of what was deemed an unreasonable search and seizure when it was adopted." *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 284, 69 L.Ed. 543. The Amendment itself spoke in terms of protection "against unreasonable searches and seizures" and it seems logical that the factor of a nighttime search is sensitively related to the reasonableness issue.

At common law, prior to the adoption of the Bill of Rights there was a strong aversion to nighttime searches.[13] Although aversion to nighttime intrusion has continued to the present, the focal point of contemporary antipathy has centered around the intrusion into the home. As Justice Frankfurter stated in his concurring and dissenting opinion in *Monroe v. Pape*, 365 U.S. 167, 210, 81 S.Ct. 473, 496, 5 L.Ed.2d 492 (1960):[14] "Searches of the dwelling house were the special object of this universal condemnation of official intrusion. Night-time search was the evil in its most obnoxious form."[15] This element of a nighttime intrusion is one element in considering the reasonableness of the search.

While it is not controlling here, Rule 41, F.R.Crim.P. is a useful guide because it implements the essentials of the Fourth Amendment. *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514. Rule 41(c) requires that the warrant be served "in the daytime, unless the issuing authority, by appropriate provision in the warrant, and for reasonable cause shown, authorizes its execution at times other than daytime." Thus beyond the probable cause needed for every warrant, Rule 41(c) only requires that there be cause for carrying on

States, 416 U.S. 430, 454, 94 S.Ct. 1780, 40 L.Ed.2d 250.

10. In addition to the federal system, 23 states fit into this category; 14 other states explicitly authorize execution at any time. The remaining states have no pertinent provision. *See* Model Code of Pre-Arraignment Procedure 512 (Proposed Official Draft, 1975). *See also* 2 W. Lafave, Search and Seizure, A Treatise on the Fourth Amendment Sec. 4.7(b) (1978).

11. *See generally* annot., 26 A.L.R.3d 951 (1969).

12. The Fourth Amendment provides in part that: ". . . no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."

13. *See United States ex rel Boyance v. Myers*, 398 F.2d 896, 897 (3d Cir.) and authority cited therein.

14. *Monroe* was *overruled in part on other grounds, Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611.

15. The Supreme Court has consistently recognized that a police search of a residence at night is a greater intrusion upon an individual's privacy interest than an ordinary search. In holding a nighttime search unconstitutional in *Jones v. United States*, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514; Justice Harlan found it "difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home." *Id.* at 498, 78 S.Ct. at 1257. *See also Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S.Ct. 2022, 29 L.Ed.2d 564 (midnight entry into the home was an "extremely serious intrusion"); *United States v. Reed*, 572 F.2d 412, 422 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (one's reasonable expectation of privacy in the home is entitled to unique sensitivity from the federal courts).

the unusual nighttime search and that the issuing authority be convinced that it is reasonable under the circumstances. *United States v. Curry*, 530 F.2d 636, 637 (5th Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 89, 50 L.Ed.2d 93. *See also United States v. Searp*, 586 F.2d 1117, 1121 (6th Cir.), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474. The reasonableness of an asserted justification may, in certain cases, be difficult to determine. Resolution of marginal cases, however, is "largely determined by the preference to be accorded to warrants." *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684; *see also Jones v. United States*, 362 U.S. 257, 270, 80 S.Ct. 725, 4 L.Ed.2d 697.

Although we are confronted with a nighttime search, it is not one which intrudes into a home or is carried out by physically disturbing the owner or the person who has an interest in the personal property involved. Thus at the outset, we have a case where the circumstances are not strong for claiming unreasonableness in this nighttime search.

Here also the necessity of immediate police action is evident from the facts stated in the affidavit. After describing the circumstances surrounding the discovery of quaalude by the airline employee and his own observations of the trunk, the Arizona police officer requested a nighttime search. The justification advanced (I R. 102) for the nighttime intrusion was that it would allow the officer

to expedite the investigation and . . to determine the exact contents of the footlocker while a possible suspect may still be found. Also for other items which may be contained inside the footlocker which may aid officers in finding a suspect.

Considering the affidavit in a common-sense, nontechnical manner, *Ventresca, supra*, 380 U.S. at 108–09, 85 S.Ct. 741, we feel that the showing made justified the nighttime search authorized. It is true that the trunk was not flown out of Phoenix until about 3:50 p. m. on Sunday afternoon, May 15. However, the reasons given demonstrate that expedition of the investiga-

tion was important. And, as noted, the search involved no intrusion into a home and no disturbance of an owner of the personal property involved. We are satisfied that the search occurring early that Sunday morning was reasonable under the federal constitutional standard applicable to the conduct of the state officer, and that suppression of the evidence was not required in this federal prosecution.

*Probable cause for issuance of the warrant*

Appellant also claims that the affidavit failed to demonstrate probable cause for the issuance of the Arizona search warrant. After reviewing the facts and circumstances before the issuing judge when application for the warrant was made, *United States v. Abramson*, 553 F.2d 1164, 1168 (8th Cir.), *cert. denied*, 433 U.S. 911, 97 S.Ct. 2979, 53 L.Ed.2d 1095, we must disagree.

It is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637. Moreover, the judge who issued the warrant was informed of facts within the affiant's own knowledge, and of information received by the affiant from an informant whose statement was reasonably corroborated by facts within the affiant's knowledge, all serving as a substantial basis for the judge to believe that the substance was present in the footlocker to be searched. *Jones v. United States*, 362 U.S. 257, 269–71, 80 S.Ct. 725, 4 L.Ed.2d 697.

We feel that such probable cause was sufficiently shown by the Arizona affidavit which revealed that a small tinfoil packet had fallen out of a crack in a trunk which had been delivered for interstate shipment; that the word "quaalude" was written on the packet, the name being descriptive of a controlled substance; that the trunk contained other tinfoil packets similar to the one which had dropped from the crack; and that the return address listed on the airbill for the trunk was fictitious.

In sum we feel that none of appellant's Fourth Amendment claims are valid and

that the motion to suppress was properly denied.

### III. *The grand jury testimony*

Appellant further asserts that the Government improperly used the grand jury to discover and to preserve evidence to be used at his trial on the already pending indictment. Specifically he claims that James Michael Hoover, his co-defendant, testified before a grand jury subsequent to their indictment and that Hoover's trial testimony was "substantially the same" as his grand jury testimony. The sequence of Hoover's testimonial appearances, the appellant contends, constituted an abuse of the grand jury system because it permitted the Government to discover new evidence against him and to freeze and preserve Hoover's testimony for trial. Thus appellant says that the admission of Hoover's testimony was reversible error. Brief of Appellant at 12.

The Government contends that the grand jury appearance of Hoover was for the "singular purpose" of obtaining evidence concerning other persons who had not been indicted. Moreover it argues that the record is devoid of evidence to support a claim that the Government was attempting to freeze Hoover's testimony or to discover new evidence against the appellant. The Government points out that the record indicates that Hoover had previously revealed the substance of his trial testimony in an interview with a Government agent.[16] The written summary of that interview, the Government suggests, "demonstrates the lack of need . . . to subsequently freeze" Hoover's testimony through a grand jury appearance.[17] This, the Government concludes, also supports its claim that it did not garner any new evidence against the appellant due to Hoover's grand jury appearance.[18]

We must agree, of course, that it is improper to use the grand jury for the primary purpose of strengthening the Government's case on a pending indictment or as a substitute for discovery, although this may be an incidental benefit. *See, e. g., United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.), *cert. denied,* 434 U.S. 863, 98 S.Ct. 195, 54 L.Ed.2d 138; *United States v. Woods,* 544 F.2d 242, 250 (6th Cir.); *In re Santiago,* 533 F.2d 727, 730 (1st Cir.); *United States v. Fisher,* 455 F.2d 1101, 1104–05 (2d Cir.); *United States v. George,* 444 F.2d 310, 314 (6th Cir.); *United States v. Dardi,* 330 F.2d 316, 336 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50; *In re National Window Glass Workers,* 287 F. 219, 223, 227 (N.D.Ohio). However, where there is another legitimate purpose behind the grand jury investigation, the proceeding would not be improper merely because the Government may derive an incidental benefit. *Application of Iaconi,* 120 F.Supp. 589, 590–91 (D.Mass.).

The appellant has not demonstrated that Hoover's testimony before the grand jury was for the sole or dominant purpose of preparing a pending indictment for trial. *United States v. Woods, supra,* 544 F.2d at 250. The indictment against appellant and Hoover charged that they conspired "with others to the Grand Jury unknown." I R. 1. Clearly the grand jury could legitimately call witnesses in an attempt to identify these persons. Moreover, the appellant made no showing that Hoover was not called to accomplish this proper objective. *United States v. Woods, supra,* 544 F.2d at 250. Merely because a witness' grand jury testimony and trial testimony are similar does not *ipso facto* indicate an improper purpose. At trial Hoover testified about some questions asked of him at the grand jury proceeding [19] which demonstrat-

---

16. Brief of Appellee at 22, citing II R. 192.

17. Brief of Appellee at 28, citing II R. 217. While the Government had a written summary of Hoover's interview with DEA Agent Beck on August 26 marked as an exhibit, it was never introduced in evidence. Nevertheless, because there was uncontradicted testimony by Hoover that the written summary of that interview was substantially the same as his trial testimony, we feel that the Government's position can arguably be supported by the record. II R. 191–92, 217.

18. Brief of Appellee at 23.

19. II R. 292–96.

ed an attempt to put before the grand jury the identity of unindicted coconspirators or persons involved in some illegal activities. Moreover the appellant did not demonstrate improper use of the grand jury proceeding to discover evidence or to freeze Hoover's testimony.

We hold that appellant did not demonstrate an abuse of the grand jury system and that the trial court properly admitted into evidence the testimony of Michael Hoover and correctly denied the motion to dismiss or for a mistrial due to a misuse of the grand jury.

#### IV. Sufficiency of the evidence to support the conviction

Appellant argues that the trial court erred in overruling a motion to dismiss, saying that the evidence was insufficient to support the conviction.

First appellant says that the evidence "was totally insufficient to establish an agreement among two or more persons to commit" a crime and that it was "insufficient to show that the Defendant was a part of any such agreement." Brief of Appellant at 10. It would seem that evidence of an agreement relates solely to the conspiracy count of the indictment. Appellant was acquitted on that count; consequently this question is moot and we need only consider the proof on the charge under 21 U.S.C. Sec. 841(a) of possession with intent to distribute.

As noted the testimony of detectives Dee and Clark tended to show that the appellant had the drugs in his possession at the time of his arrest. The Government also presented the testimony of Hoover and Debbie Darnel, his girlfriend. The testimony of Hoover tended to show that he and the appellant had negotiated a purchase of drugs from an individual in Arizona; that they planned to resell the drugs at a profit to another individual in Oklahoma; and that Hoover made the purchase in Arizona while the appellant supplied most of the money. II R. 155, 157–60. Hoover further testified that on the Thursday before his trip to Arizona, appellant asked Hoover to come by his house to count the money and to tape it to Hoover's legs. They came up with $34,000, $31,000 of which belonged to appellant. II R. 164–66.

Hoover also testified that on his return from Arizona on Saturday, May 14, he went to appellant's house and informed him of the quaalude purchase and of the plan to ship the drugs from Arizona in a trunk. II R. 176–77. Hoover also stated that on Sunday, May 15, he was informed by his supplier of the pending drug shipment by airfreight; that he notified the appellant of the shipment; that he and the appellant made plans to ride out to the airport together to pick up the trunk; and that they planned to immediately resell the drugs that night to an individual who was waiting at appellant's house. II R. 178–81.

Debbie Darnel testified that Hoover and appellant had negotiated several drug deals together; that appellant supplied the money while Hoover made the purchases and sales; that she witnessed the appellant and Hoover counting the money for the Arizona drug deal; that she saw the appellant and his wife tape the money to Hoover's legs; and that Hoover used a pair of appellant's wife's knee socks to conceal the money while it was taped to his legs. She further said that on the evening of the appellant's arrest, a man was waiting at appellant's house to repurchase the drugs. II R. 299–300, 305, 312.

Appellant took the stand and denied any involvement in a drug scheme. He said he was merely helping his friend pick up the footlocker at the airport, not knowing about the drugs being concealed in it. II R. 257, 264–78. Two character witnesses also testified for appellant.

When reviewing the sufficiency of the evidence to support a guilty verdict on appeal, this court will not weigh conflicting evidence nor consider the credibility of witnesses. *United States v. Downen*, 496 F.2d 314, 318 (10th Cir.), *cert. denied*, 419 U.S. 897, 95 S.Ct. 177, 42 L.Ed.2d 142. We must view the evidence, together with all reasonable inferences therefrom, in the light most favorable to the Government. *United States v. Twilligear*, 460 F.2d 79, 81–82 (10th Cir.). Viewed in this light we

are satisfied that the evidence amply supports the conviction.

### V. *The voir dire incident*

Lastly, the appellant contends that he was denied a fair and impartial trial because the entire jury panel had been prejudiced against him due to a prospective juror's remarks during voir dire. The asserted error arose during the trial court's inquiry into a prospective juror's prior experience with law enforcement. While having no immediate family experience, the juror indicated that her husband's cousin had been in law enforcement. The record reflects the following colloquy between the court and the potential juror (I R. 33):

The Court: Well, that is rather remote. But if it would having any bearing upon your deliberations, we would like to know about it.

Juror: I am afraid it would, sir.

The Court: You think it might?

Juror: Yes.

The Court: Tell us who he is.

Juror: He was a narcotics agent in Texas and he was killed.

The Court: Oh, he was, and he may have discussed the things that he does as an enforcement officer around the home, around your home, rather, and you think that might tend to influence your deliberations?

Juror: Yes.

The judge excused this juror. Promptly after the incident, the trial court gave a cautionary instruction to the jury panel [20] and sought to determine if all the jurors could ignore the statement when rendering a verdict. After obtaining an affirmative answer from the jurors, the trial court continued the voir dire and impanelled a jury. After the swearing in of the jury, the appellant registered his objection to the entire jury panel and asked for its dismissal.

In support of his motion appellant argued, and says on this appeal, that it would be impossible for the trial court to determine how much prejudice was caused by the juror's statements and that the possibility of any prejudice arising from the statement, no matter how slight, required a dismissal of the jury. II R. 56; Brief of Appellant at 20. The Government argued at trial, and contends here, that the cautionary instruction cured any possible prejudice which may have arisen due to the improper remark. II R. 57; Brief of Appellant at 30.

The trial judge said that assuming the jurors were honest in saying they would base their verdict on the evidence and would not be influenced by the remark, he was going to deny the motion. The court stated that he frankly felt that if they had voted within some ten minutes after the incident, he felt they could not have put it out of their minds and would have been influenced by what the juror said; that as time elapsed, they were more likely to forget the statements; that "by tomorrow maybe they will have forgotten it"; and that any further instruction on the incident would probably do more harm than good. II R. 58.

The trial court has broad discretion in conducting the voir dire examination. *United States v. Colabella*, 448 F.2d 1299, 1303 (2d Cir.). The ruling on a motion to dismiss or for a mistrial based on improper statements during voir dire is within the sound judicial discretion of the trial court. Moreover, the court's ruling will not be disturbed, absent a clear showing of abuse of that discretion. *See e. g., United States v. Wade*, 467 F.2d 1226, 1229 (8th Cir.); *cf. United States v. Evans*, 542 F.2d 805, 815 (10th Cir.) (within discretion of trial court to grant mistrial motion based on disruptive incidents at trial), *cert. denied*, 429 U.S. 1101, 97 S.Ct. 1124, 51 L.Ed.2d 550; *McBride v. United States*, 409 F.2d 1046, 1048 (10th Cir.) (within discretion of trial court to grant mistrial motion based on improper testimony by witness). The trial court is in the best position to judge the effect which improper statements might have upon a jury and the sincerity of the jurors' promises to disregard it. *See United States v. Wade, supra*, 467 F.2d at 1229; *cf. McBride v. United States, supra*, 409 F.2d

20. II R. 34–35.

at 1048. When a motion to dismiss the jury panel is grounded on the contention that an improper statement has prejudiced the jury against him, the question is "whether 'there was an impingement upon the right of the appellant to be tried before a fair and impartial jury.'" *United States v. Evans, supra,* 542 F.2d at 815; *see also Bailey v. United States,* 410 F.2d 1209, 1215 (10th Cir.), *cert. denied,* 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232.

Defendant relies on *State v. Woodard,* 134 Vt. 154, 353 A.2d 321. There a sitting juror overheard the defendant make a telephone call during which he said that "I'm hung unless I have an alibi" or "I'm hung and I've got to have an alibi." The juror then heard the testimony of two more witnesses before reporting the incident and being excused. In reversing the conviction, the court held that the defendant did not have to show actual influence on the jury because the circumstances went to the integrity of the jury and to a possible infringement on defendant's right to an untainted jury. *Cf. United States v. Beasley,* 464 F.2d 468, 470 (10th Cir.). We feel that such potential of prejudice by a sitting juror during trial is a distinguishable case.

Here we cannot say that the trial court abused its discretion in denying the motion. In addition to a cautionary instruction to the jury, *see generally Brown v. United States,* 380 F.2d 477, 479 (10th Cir.), *cert. denied,* 390 U.S. 962, 88 S.Ct. 1062, 19 L.Ed.2d 1158; the court questioned the jurors in order to be satisfied that the statement had no prejudicial impact upon them. II R. 35. *See generally United States v. Colabella, supra,* 448 F.2d at 1302-03; *United States v. Evans, supra,* 542 F.2d at 815. The trial court's assessment is entitled to great weight. *McBride v. United States, supra,* 409 F.2d at 1048. Finally we note that the jury's ability to render a fair verdict is indicated by its acquittal of the appellant on the conspiracy count. *See generally United States v. Evans, supra,* 542 F.2d at 815; *Bailey v. United States,* 410 F.2d 1209, 1215 (10th Cir.), *cert. denied,* 396 U.S. 933, 90 S.Ct. 276, 24 L.Ed.2d 232.

The remaining contentions of appellant require no further discussion. We are satisfied that no reversible error is demonstrated and the judgment is

AFFIRMED.