**UNITED STATES of America**

v.

**Stephen FLEMMI, et al.**

**No. 94–10287–MLW.**

United States District Court,
D. Massachusetts.

July 5, 2000.

Richard M. Egbert, Boston, MA, Kenneth J. Fishman, Fishman, Ankner & Hirstman, LLP, Boston, MA, Thomas J. Hennessey, Bingham, Dana & Gould, Boston, MA, for Defendant.

Fred M. Wyshak, Jr., Brian T. Kelly, U.S. Atty's Office, Boston, MA, for U.S.

## MEMORANDUM AND ORDER

WOLF, District Judge.

### I. SUMMARY

The defendant Stephen Flemmi has moved to dismiss this case because, he alleges, after the return of the Second Superceding Indictment the government improperly used the grand jury to investigate the Racketeer Influenced Corrupt Organization ("RICO") crimes with which he had already been charged.[1] Alternatively, Flemmi requests more limited relief, including the exclusion at trial of evidence that was obtained as a result of the alleged abuse of the grand jury.

Upon consideration of a series of submissions and the arguments presented at several hearings, Flemmi's motion is being allowed in part and denied in part. The case is not being dismissed. Certain evidence will, however, be excluded at trial. The reasons for this decision are described in detail in this Memorandum. They are summarized as follows.

■■■ The government may not call a witness before a grand jury primarily or exclusively to obtain additional evidence that an indicted defendant has committed a crime with which he has already been charged. The government may, however, use the grand jury to investigate other federal offenses that a defendant may have committed or to investigate whether other individuals should be added as defendants to the existing charges. The government may at the trial of a previously pending indictment use evidence incidently gained by a grand jury primarily investigating other federal crimes.

In this case, Flemmi was charged in the First and Second Superceding Indictments with committing RICO and RICO conspiracy offenses. With regard to the RICO charges, it was alleged from the outset that he was part of an Enterprise that engaged in murder and extortion from 1967 to 1995. It was also alleged that Flemmi participated in the affairs of that Enterprise through a pattern of racketeering activity consisting primarily of violent crimes, particularly, in the Second Superceding Indictment, sixteen extortions and the attempted murder of John Fitzgerald in 1968.

Prior to obtaining the First and Second Superceding Indictments the government had been investigating whether Flemmi participated in the 1967 murders of Edward "Wimpy" Bennett, Walter Bennett, and William Bennett. When those indictments were returned, the government did not have sufficient evidence to charge the murders as racketeering acts. The government did, however, intend to attempt to introduce at trial the testimony of Robert Daddieco concerning those killings in order to prove that the Enterprise had, as alleged, engaged in murder. The government also intended to seek to introduce evidence of a race-fix scheme in the 1970s in order to prove the existence of the alleged Enterprise.

Following the return of the Second Superceding Indictment, the government called a series of witnesses before the grand jury to testify about the race-fix scheme. The primary purpose of calling those witnesses was to develop substantive sports bribery charges against Flemmi's then codefendant John Martorano. Evidence concerning Flemmi's involvement in the race-fix scheme was acquired incidental to what became a successful investigation of Martorano. As a result, the Third Superceding Indictment charged Flemmi with participating in the race-fix scheme as part of his pattern of racketeering activity, but not as a substantive offense. Contrary to Flemmi's contention, this was permissible. Therefore, evidence concerning the race-fix scheme acquired by the grand jury after the return of the Second Superceding

---

1. Several of Flemmi's codefendants originally joined in his motion. They have since pled guilty.

Indictment in connection with the investigation of John Martorano may be used at Flemmi's trial.

Following the return of the Second Superceding Indictment the government also used the grand jury improperly to investigate the existing RICO charges against Flemmi. More specifically, the government used the grand jury to immunize, compel, and freeze the otherwise unavailable testimony of Hugh Shields and a witness referred to as John Doe 2 regarding Flemmi's alleged role in the 1967 murders of the Bennett brothers and William Grasso. In the Third Superceding Indictment the murders were alleged as additional acts constituting part of Flemmi's pattern of racketeering activity.

The grand jury's investigation of Flemmi's possible role in the murders of the Bennett brothers and Grasso would have been permissible if the killings constituted potentially prosecutable federal criminal offenses. However, in 1967 murder in aid of racketeering was not a federal offense. Therefore, the killings were relevant to the grand jury's investigation only as additional evidence that the alleged Enterprise engaged in murder and as crimes under state law that could constitute possible additional racketeering acts.

The use of the grand jury to compel the testimony of Shields and John Doe 2 also would have been permissible if the addition of the four murder racketeering acts caused the RICO crimes charged in the Third Superceding Indictment to be different crimes than those charged in the Second Superceding Indictment. They did not, however, have this effect.

In order for the RICO charges in the Third Superceding Indictment to constitute new crimes, they would have had to allege either a different Enterprise or that Flemmi participated in the affairs of the Enterprise through a distinctly different pattern of racketeering activity. However, the Second and Third Superceding Indictments allege exactly the same Enterprise—an Enterprise that engaged primarily in murder and extortion.

The addition of the murder racketeering acts to the Third Superceding Indictment did not alter the statutory elements of the offenses with which Flemmi was charged, RICO and RICO conspiracy. Moreover, the government would not be required to prove any of the new murder racketeering acts in order to secure Flemmi's conviction on the RICO charges in the Third Superceding Indictment. Rather, it would be sufficient for the government to prove any two of Flemmi's alleged Racketeering Acts common to the Second and Third Superceding Indictments in order to establish the pattern of racketeering activity required to convict Flemmi on the substantive RICO charge. The government need not prove any of the alleged Racketeering Acts to prove the alleged RICO conspiracy.

The addition of the four murder racketeering acts to the Third Superceding Indictment also did not render the *pattern* of racketeering activity alleged to be truly distinct from the pattern alleged in the Second Superceding Indictment. The time periods and individuals allegedly involved remained the same. The heart of Flemmi's alleged pattern of racketeering activity remained violent crimes, particularly the same sixteen extortions. The four murders were close in time and comparable in nature to the attempted murder of Fitzgerald. They are also events for which the government could and would have sought to have Flemmi punished at sentencing as part of his underlying racketeering activity if he were convicted on the RICO charges in the Second Superceding Indictment. Although alleging the murders as Racketeering Acts raises the statutory maximum penalty for each RICO charge from twenty years to life in prison, as the government acknowledges Flemmi's "conviction on multiple counts [in the Second Superceding Indictment] could result in consecutive sentences that essentially amount to a life sentence."

In these circumstances, Flemmi's pattern of racketeering activity alleged in the Third Superceding Indictment is not sufficiently different from the pattern alleged previously to cause the RICO charges to be new and different from the RICO crimes of which he was accused in the Second Superceding Indictment. Therefore, by using the grand jury to compel the otherwise unavailable testimony of Shields and John Doe 2, the government employed it to obtain additional evidence of the RICO offenses with which Flemmi was already charged. This was not permissible.

Although an abuse of the grand jury has been proven, it is not appropriate to grant Flemmi's request to dismiss this case because of that abuse alone. Rather, the court is ordering the exclusion at trial of the testimony of Shields and John Doe 2, and of any evidence derived from the information that they provided to the grand jury.

This decision does not necessarily mean that Flemmi, in effect, is being allowed to "get away with murder" if he participated in the killings of the Bennett brothers and Grasso. Both uncharged conduct and charges of which a defendant has been acquitted may be considered at sentencing. In addition, there are circumstances in which evidence excluded at trial, such as illegally seized drugs or weapons, has been deemed admissible at sentencing. The government already has expressed its intention to attempt to use at sentencing the evidence concerning the murders provided by Shields and John Doe 2 if Flemmi is convicted of a RICO offense. While it is at least premature to decide now what evidence may be considered at sentencing, the fact that Shields and John Doe 2 will be prohibited from testifying at trial does not necessarily mean that they will be prohibited from testifying at a sentencing hearing if the evidence that is admitted at trial proves that Flemmi is guilty.

In any event, it is the duty of the court to apply the well established law to the facts as it has found them and to provide Flemmi the remedy for the violation of his rights to which any other defendant would be entitled. This is a fundamental function that courts are constituted to perform.

## II. *APPLICABLE LAW*

It is well established that the government may not call a witness before a grand jury primarily or exclusively to strengthen an existing case against an indicted defendant. *See In re Grand Jury Proceedings; Diamante,* 814 F.2d 61, 70 (1st Cir.1987) (*"Diamante"*); *In re Maury Santiago,* 533 F.2d 727, 730 (1st Cir.1976); *United States v. Doe,* 455 F.2d 1270, 1273 (1st Cir.1972) (*"Doe"*); *In re Grand Jury Subpoena Duces Tecum Dated Jan. 2, 1985 (Simels),* 767 F.2d 26, 29 (2d Cir.1985) (*"Simels"*); *United States v. Sasso,* 59 F.3d 341, 351 (2d Cir.1995); *United States v. Beasley,* 550 F.2d 261, 266 (5th Cir.1977); *United States v. Thompson,* 944 F.2d 1331, 1337 (7th Cir.1991); *United States v. Gibbons,* 607 F.2d 1320, 1328 (10th Cir.1979). It is, therefore, "an abuse of the grand-jury process if the grand jury is used for the purpose of merely discovering or preserving testimony for use against a person who is already under indictment." Charles A. Wright, 1 *Federal Practice and Procedure: Criminal 3d* § 111.1 at 491 (1999).

Accordingly, courts have explained that it is improper to employ a grand jury to obtain evidence to be used against a defendant in a pending case. *Diamante,* 814 F.2d at 70; *Doe,* 455 F.2d at 1273; *Simels,* 767 F.2d at 30; *Thompson,* 944 F.2d at 1337. As the government now acknowledges, a classic form of post-indictment grand jury abuse would be using the grand jury to immunize and compel the testimony of a witness who is unwilling to testify in an effort to strengthen an existing charge. Sept. 27, 1996 Transcript ("Tr.") at 50. It is also impermissible to use the grand jury to "freeze" the testimony of a witness, such as a reluctant witness the government fears may change his testimony in the future. *United States v. Fisher,*

455 F.2d 1101, 1104 (2d Cir.1972); *Gibbons*, 607 F.2d at 1329; *United States v. Jackson*, 863 F.Supp. 1449, 1454 (D.Kan. 1994) (citing cases).

■ However, "[t]he courts have made clear that the grand jury is entitled to continue to investigate the indicted defendant, if that investigation is for a purpose other than to discover evidence relating to charges in the pending indictment." Sara Sun Beale & William C. Bryson, 2 *Grand Jury Law and Practice* § 10:15 at 52–53 (1986). It is, therefore, permissible for the government to present additional testimony to a grand jury primarily or exclusively to attempt to develop a superceding or separate indictment which will charge an indicted defendant with additional crimes, or charge at least one other person with an offense already alleged in the existing indictment. *Gibbons*, 607 F.2d at 1328; *United States v. LaPorta*, 46 F.3d 152, 161 (2d Cir.1994); *United States v. Leung*, 40 F.3d 577, 581 (2d Cir.1994).

■ "The prosecutor at a trial [of a pending indictment] . . . may use evidence *incidentally* gained from a grand jury primarily investigating other *crimes.*" *Diamante*, 814 F.2d at 70 (emphasis added). *See also Doe*, 455 F.2d at 1273; *Gibbons*, 607 F.2d at 1328; *Beasley*, 550 F.2d at 266. It is, however, essential that (1) the government be genuinely investigating another crime, rather than the crime charged in the pending indictment, and (2) the evidence at issue be obtained incidently in that investigation.

The Court of Appeals for the First Circuit has recognized the challenge posed in enforcing the rule that the government may not use the grand jury primarily or exclusively to strengthen a pending case, but may use at trial evidence incidently gained from a grand jury investigating another crime. *Diamante*, 814 F.2d at 70–71. *See also Simels*, 767 F.2d at 30. On

one hand, prosecutors are generally permitted to utilize grand juries without supervision or interference by the courts, and grand jury proceedings are granted a presumption of regularity. *Diamante*, 814 F.2d at 70–71. On the other hand, the potential for abuse after a defendant is indicted is substantial because:

> "The government has at its disposal one of the most effective discovery mechanisms yet devised—the grand jury. This body may call witnesses under compulsory process and examine them in secret under oath, unhampered by the rules of evidence or an adversary counsel's cross-examination, or in the case of a 'prospective defendant' by Fifth Amendment immunity."

*Doe*, 455 F.2d at 1275 (quoting 8 *Moore's Federal Practice* ¶ 16.08[1], at 16–100 (2d ed.1970)). *See also Diamante*, 814 F.2d at 71.

In the instant case, the court assumes, without finding, that the burden of proving grand jury abuse is on Flemmi. *Compare Diamante*, 814 F.2d at 71 (courts lock at circumstances of particular cases in deciding showing required from party challenging grand jury evidence or from government) and *United States v. Kovaleski*, 406 F.Supp. 267, 270 (E.D.Mich.1976) (placing burden of proof on government) *with Leung*, 40 F.3d at 581 (burden of proof on defendant); *Thompson*, 944 F.2d at 1337 (burden on defendant); *Gibbons*, 607 F.2d at 1328 (same); *United States v. Woods*, 544 F.2d 242, 250 (6th Cir.1976) (same). The court also has analyzed individually the government's purpose in calling each witness whose testimony is now at issue. *See Sasso*, 59 F.3d at 351; *Thompson*, 944 F.2d at 1337–39; *Simels*, 767 F.2d at 28–29; *Matter of Grand Jury Subpoenas Issued May 3, 1994 for Nash*, 858 F.Supp. 132, 135 (D.Ariz.1994).[2] In deciding the purpose for which each relevant witness

---

**2.** The government acknowledges that in addressing a claim of grand jury abuse the court must determine the primary purpose for which each individual witness was called rather than the dominant purpose of the continuing grand jury investigation generally. *See* Sept. 17, 1996 Tr. at 52; May 23, 2000 Tr. at 62, 73.

was called, the court has considered the credible direct and circumstantial evidence. *See Leung*, 40 F.3d at 581 (analyzing, among other things, timing of government actions); *Simels*, 767 F.2d at 29 ("timing of the subpoena casts significant light on its purposes").

■ Based on the facts and analyses set forth below, the court finds that Flemmi has proven that after the return of the Second Superceding Indictment the government abused the power of the grand jury by compelling the otherwise unavailable testimony of Shields and John Doe 2 solely to strengthen the existing RICO and RICO conspiracy charges against him. Shields' testimony also led the government to obtain additional information from Daddieco to strengthen the existing RICO and RICO conspiracy charges and to present it, along with other information previously in its possession, to the grand jury that returned the Third Superceding Indictment.

The evidence presented to that grand jury concerning the race-fix conspiracy in the 1970's, however, did not constitute an abuse of the grand jury process because the witnesses who testified before the grand jury were subpoenaed primarily to develop additional, substantive charges against John Martorano.

### III. *FACTS*

On October 25, 1994, a two-count indictment was returned charging Robert DeLuca with conspiring to violate, and violating, the Travel Act, 18 U.S.C. § 1952, by traveling from Rhode Island to Massachusetts, on October 29, 1989, to participate in a ceremony to induct new members of the Patriarca Family of La Cosa Nostra (the "LCN"). The timing of the indictment evidently was influenced by the fact that the five-year statute of limitations on these offenses was about to expire.

On January 10, 1995, the government obtained a ninety-page superceding indictment that radically altered the charges in the case originally brought against DeLuca. The First Superceding Indictment (cited as "1SI") added six new defendants: Flemmi, James "Whitey" Bulger, Francis P. Salemme, George Kaufman, Francis P. Salemme Jr. and James Martorano.

Counts 1 and 2 of the First Superceding Indictment charged all seven defendants with conspiring to violate, and violating, the RICO statute, 18 U.S.C. § 1962. The government characterized the alleged RICO Enterprise as an "amalgam" of members of the Patriarca Family, such as Salemme and DeLuca, and members of the Winter Hill Gang, including Flemmi and Bulger, who used their positions in their respective organizations to operate as a criminal cartel. *See* 1SI, ¶ 1(j); March 27, 1996 Gov.'s Consolidated Resp. to Defs.' Pretrial Mots. Regarding Sufficiency of Indictment and Other Related Issues ("Mar. 27, 1996 Gov. Consolidated Resp.") at 2.

That Enterprise was alleged to have been engaged in various criminal activities. First among them, according to the First Superceding Indictment, was murder. *See* 1SI ¶ 1(j). The second form of criminal activity in which the Enterprise was allegedly engaged was extortion. *Id.*

Although the government subsequently secured three more superceding indictments, the nature of the alleged Enterprise never changed. *See* 2SI ¶ 1(k), 3SI ¶ 1(k), 4SI ¶ 1(k); June 12, 1996 Tr. at 10–11; Sept. 17, 1996 Tr. at 36. In four successive indictments it was alleged that the Enterprise was "engaged in criminal activities, consisting of acts involving murder" and other offenses such as extortion. *Id.*

The First Superceding Indictment charged that the alleged RICO conspiracy began in approximately 1967 and continued until the time of the indictment in 1995. 1SI ¶ 2. It alleged that the defendants greed to commit a total of thirty-one racketeering acts (cited as "RA") in the conduct of the affairs of the Enterprise and that Salemme also violated the RICO

statute by engaging in the collection of an unlawful debt. 1SI ¶¶ 18–49.

The earliest Racketeering Act charged Flemmi and Salemme with attempting to murder John Fitzgerald in January 1968, in violation of Mass. Gen. L. c. 265, § 18. 1SI ¶ 37, RAs 20A & 20B. The attempt to murder Fitzgerald was not alleged as a substantive count because the federal law prohibiting murder in aid of racketeering, 18 U.S.C. § 1959, was not enacted until 1984.

The First Superceding Indictment also charged that from 1979 to June 1994, all seven defendants conspired to extort money, known as "rent," from bookmakers, in violation of 18 U.S.C. § 1951, 1SI ¶ 18, RA 1, and that specified defendants personally participated in sixteen different rent extortions. 1SI ¶¶ 20–34, 46, RAs 3–17, 29.[3] In addition, the First Superceding Indictment alleged that from 1970 to June 1994 the defendants committed numerous Racketeering Acts involving illegal gambling, loansharking, and extortion.[4]

In the First Superceding Indictment Flemmi was charged with committing fifteen Racketeering Acts, twelve of which involved extortion. 1SI ¶ 18, RA 1; ¶ 19, RA 2; ¶ 22, RA 5; ¶ 23, RA 6; ¶ 24, RA 7; ¶ 25, RA 8; ¶ 26, RA 9; ¶ 27, RA 10; ¶ 28, RA 11; ¶ 31, RA 14; ¶ 33, RA 16; ¶ 34, RA 17; ¶ 37, RAs 20A & 20B; ¶ 41, RA 24; ¶ 46, RA 29. Thus, from the outset of the case against him, Flemmi was charged with participating in the affairs of the Enterprise through a pattern of racketeering activity composed almost exclusively of violent crimes: attempted murder and extortion.

On August 1, 1995, the government obtained a Second Superceding Indictment ("2SI"). The indictment deleted as defendants Kaufman and Francis P. Salemme Jr., who had died. It also added a new defendant, John Martorano, who had been a fugitive from RICO charges brought in 1979 against Howard Winter, himself, and others relating to a scheme to fix horse races. *United States v. Winter*, 663 F.2d 1120, 1124–25 (1st Cir.1981); Superceding Indictment, *United States v. Winter et al.*, Cr. No. 79–42–MA.

The Second Superceding Indictment did not allege any additional racketeering acts or new substantive crimes concerning the surviving defendants who had been charged in the First Superceding Indictment. The alleged Enterprise and the alleged pattern of racketeering activity concerning the remaining defendants were unaltered.

On September 15, 1995, the court held a conference with counsel to identify and schedule pretrial matters. In response to an inquiry by the court, the government stated that there was an ongoing grand jury investigation of possible money laundering charges that focused on Bulger and Flemmi. Sept. 15, 1995 Tr. at 34. The government, however, stated its intention to go to trial on the Second Superceding Indictment and, if money laundering charges were warranted, seek a separate indictment rather than another superceding indictment. *Id.* at 49.

The grand jury continued to investigate possible money laundering violations by Flemmi and others. On March 11, 1997, Flemmi and several codefendants were charged with money laundering in a separate indictment, which was assigned to, and remains pending before, Judge Robert Keeton. *United States v. Flemmi, et al.*, Cr. No. 97–10060–REK.

---

3. The conspiracy to extort rent from bookmakers, and the particular extortions, were each also charged as substantive crimes. 1SI Counts 3–17.

4. The Racketeering Acts involving illegal gambling were: 1SI ¶ 19, RA 2; ¶ 39, RA 22; ¶ 40, RAs 23A & 23B; ¶ 44, RA 27; ¶ 45, RA

28. The Racketeering Acts involving loansharking were: 1SI ¶ 15, RA 18; ¶ 36, RA 19; ¶ 42, RA 25; ¶ 43, RA 26. The Racketeering Acts involving extortion were: 1SI ¶ 18, RA 1; ¶¶ 20–34, RAs 3–17; ¶ 39, RA 22; ¶ 40, RAs 23A & 23B.

The government, however, also used the grand jury to acquire otherwise unavailable evidence in order to strengthen the RICO and RICO conspiracy charges against Flemmi and Salemme in the Second Superceding Indictment. When the Second Superceding Indictment was returned the government had some evidence that Flemmi and Salemme had participated in the 1967 murders of the Bennett brothers. It is not clear whether the government had any evidence of the alleged involvement of Flemmi and Salemme in the murder of Grasso when the Second Superceding Indictment was returned. In 1969, Flemmi and Salemme were charged in state court with the murder of William Bennett. *See United States v. Salemme*, 91 F.Supp.2d 141, 182 (D.Mass.1999). That state case, however, was later dismissed. *Id.* at 151, 154, 185.

The murders of the Bennett brothers were the subject of the government's federal grand jury investigation prior to the issuance of any indictment in this case. May 23, 2000 Tr. at 10, 38. When the Second Superceding Indictment was returned the government had information provided by Daddieco that Flemmi and Salemme were involved in those murders. *See* May 25, 2000 letter to defense counsel transmitting September 9, 1969 Federal Bureau of Investigation ("FBI") report containing information received from Daddieco regarding Bennett murders (Under Seal). Although Daddieco testified about the Fitzgerald bombing before the grand jury on October 18, 1994, prior to the return of the First Superceding Indictment he was not asked about the murders of the Bennett brothers or Grasso. *See* Oct. 18, 1994 Tr. (Under Seal) at 3–14.[5]

At that time, Daddieco's credibility was subject to serious challenge. For example, he had claimed originally that Salemme and Flemmi had participated in the Fitzgerald bombing, but later recanted his

charges against Flemmi. *See* Oct. 18, 1994 Tr. (Under Seal) at 11–14; Jan. 6, 1998 Tr. at 105–06; Apr. 21, 1998 Tr. at 58.

As the government recognized, the murders of the Bennett brothers and Grasso could not have been charged as federal crimes because, as described earlier, in 1967 murder in aid of racketeering was not a federal offense. *See* Sept. 17, 1996 Tr. at 59–60. Those killings, however, were relevant as potential evidence that the purported Enterprise had, as alleged, engaged in murder. *Id.* They also constituted possible additional alleged racketeering acts.

However, although the grand jury had been investigating the killings, as the government has repeatedly represented, when the Second Superceding Indictment was returned the government did not have sufficient evidence to charge the murders of the Bennett brothers and Grasso as racketeering acts. *See* May 24, 1996 Aff. ¶¶ 2, 3, 11; Sept. 27, 96 Tr. at 53–54, 69, 81; May 23, 2000 Tr. at 14–15. Nevertheless, the government then intended to introduce testimony from Daddieco concerning those killings as evidence that the alleged Enterprise was engaged in murder, and that Flemmi and Salemme had participated in the Fitzgerald bombing. Sept. 17, 1996 Tr. at 66–67, 69; Sept. 27, 1996 Tr. at 53, 74; Mar. 27, 1996 Gov. Consolidated Resp. at 8–10.

After the return of the Second Superceding Indictment, the government was interested in obtaining additional evidence to bolster the proposed testimony of Daddieco. Thus, it continued the investigation of the murders of the Bennett brothers and Grasso.

In October 1995, investigators confronted Shields. Oct. 10, 1996 Aff. ¶ 2. Shields had not previously cooperated with the government. *Id.* at ¶ 3. In October 1995, he refused to provide any information to the government investigators voluntarily

---

5. Prior to the return of either the First or Second Superceding Indictment the government also may have presented the grand jury

with evidence intercepted by electronic surveillance concerning the murders of the Bennett brothers. May 23, 2000 Tr. at 37–39.

and expressed his intention to assert his Fifth Amendment right not to testify if subpoenaed to appear before a grand jury. *Id.* at ¶ 2; Oct. 6, 1995 Application for Order Compelling Shields to Testify Pursuant to 18 U.S.C. § 6003 and Oct. 10, 1995 Order, filed Apr. 12, 2000 with Gov. Supplemental Submission in Resp. to Court's March 27, 2000 and April 7, 2000 Orders.

In October 1995, the government believed that it was permissible to use the grand jury to discover additional evidence of criminal activity by Flemmi and Salemme even if that conduct could not be charged as a new or additional federal offense. May 23, 2000 Tr. at 71–74. Prior to trial, the government must employ the grand jury if it wishes to obtain an immunity order compelling a witness to provide information. *See* 18 U.S.C. § 6003.[6] With regard to Shields, the government used the grand jury to obtain an immunity order pursuant to 18 U.S.C. § 6003 and to compel what it acknowledges was his otherwise unavailable testimony. *See* Oct. 10, 1995 Order; Apr. 11, 2000 Gov.'s Submission in Resp. to Court's March 27, 2000 and April 7, 2000 Orders at 2–3.

Pursuant to that Order, Shields testified before the grand jury on October 17, 1995, and provided evidence concerning the murders of the Bennett brothers and Grasso. *See* Oct. 17, 1995 Tr. (Under Seal). Shields' appearance before the grand jury provided the government with information it would not have otherwise obtained. It also in effect "froze" the reluctant Shields' testimony by committing him to a rendition of events that he could not materially alter in the future without fear of possible prosecution for perjury.

According to the government, Shields' testimony also "led to the presentation of additional evidence" relating to the murders of the Bennett brothers and Grasso being presented to the grand jury. May 24, 1996 Aff. ¶ 11. That additional evidence included the testimony of another reluctant witness who, at the government's request, has been referred to as "John Doe 2." Like Shields, John Doe 2 refused to provide information to the government voluntarily and would have asserted his Fifth Amendment right not to testify if subpoenaed to appear before the grand jury. *See* Oct. 2, 1995 Application and Order filed April 12, 2000. Pursuant to § 6003, the government obtained an immunity order for John Doe 2 and compelled him to testify before the grand jury on November 28, 1995. As with Shields, the government acknowledges that it "used the grand jury to compel the otherwise unavailable testimony of John Doe 2." Gov. Submission in Resp. to Court's March 27, 2000 Order and April 7, 2000 Order at 2–3. John Doe No. 2's appearance before the grand jury also, in effect, froze his testimony by committing him to a version of events from which it would be difficult for him to depart at trial.

In a thus-far successful effort to persuade the court not to disclose to Flemmi at this time the grand jury testimony of John Doe 2, the government has agreed that if the grand jury testimony of Shields was improperly obtained and is, therefore, excluded, the testimony of John Doe 2 also was obtained improperly and shall be excluded. May 23, 2000 Tr. (Lobby Conference, Under Seal) at 18–20; May 24, 2000 Order.

6. Subsection a of 18 U.S.C. § 6003 states:
In the case of any individual who has been or may be called to testify or provide other information at any proceeding before or ancillary to a court of the United States or a grand jury of the United States, the United States district court for the judicial district in which the proceeding is or may be held shall issue, in accordance with subsection (b) of this section, upon the request of the United States attorney for such district, an order requiring such individual to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination, such order to become effective as provided in section 6002 of this title.

Shields' compelled testimony also led the government to speak again with Daddieco. On January 17, 1996, Daddieco was interviewed concerning the murders of the Bennett brothers and Grasso. *See* June 13, 2000 Aff. of Special Agent Michael Buckley (Under Seal).

On January 19, 1996, a hearing was conducted on various pending motions. At that hearing the court expressed reservations about admitting at trial evidence of uncharged crimes, which the government argued would be relevant to proving the Enterprise alleged in the Second Superceding Indictment. *See* Jan. 19, 1996 Tr. at 38–52; *see also* March 1, 1996 Gov.'s Resp. to Defs.' Supplemental Discovery Mots. at 9–10. The court indicated that such evidence might be excluded pursuant to Federal Rule of Evidence 403, because its probative value concerning the existence of the alleged Enterprise would be substantially outweighed by the danger of unfair prejudice, confusion of the issues, and waste of time. *Id.* The court infers that at this point the government, which was represented by experienced prosecutors, realized it would face a formidable challenge if it sought to introduce evidence of the murders of the Bennett brothers and Grasso only as proof of the Enterprise alleged in the Second Superceding Indictment, but that its prospects for success would be improved if those killings became additional racketeering acts.

On January 23, February 6, and February 20, 1996, the 1970 trial testimony of Daddieco regarding the murder of William Bennett was read to the grand jury. *See* June 5, 2000 Gov. Supplemental Submission in Resp. to Court's May 24, 2000 Order.

On February 20, 1996, FBI Special Agent Michael Buckley summarized for the grand jury the information that he had received from Daddieco on January 17, 1996, concerning the murders of the Bennett brothers and Grasso. Feb. 20, 1996 Tr. (Under Seal) at 4–13. The grand jury did not receive any additional evidence concerning those killings between February 20, 1996 and May 21, 1996, when the Third Superceding Indictment was returned. *See* May 24, 2000 Gov. Submission in Resp. to Court's May 24, 2000 Order.

On March 19, 1996, FBI Special Agent Thomas Daley appeared before the grand jury to provide information received from Anthony Ciulla concerning the race-fix scheme that had been prosecuted in the *Winter* case, 663 F.2d 1120, from which John Martorano had been a fugitive. When Martorano was apprehended, the government intended to pursue its prosecution of him on the RICO charges that had been proven in *Winter*. *Id.; see* Superceding Indictment, *United States v. Martorano*, Cr. No. 79–42–MA. However, on July 24, 1995, Judge Reginald Lindsay, over the objection of the government, dismissed those charges without prejudice because of a violation of the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* On March 19, 1996 Daley testified before the grand jury about information that the government had received from Ciulla concerning the involvement of John Martorano, James Martorano, Flemmi, Bulger, DeLuca and others in the race-fix scheme.

On March 27, 1996, the government filed its Consolidated Response to Defendants' Pretrial Motions Regarding the Sufficiency of the Indictment and Other Related Issues. That memorandum included an evidentiary proffer intended to demonstrate that the government would be able to prove the existence of the Enterprise alleged in the Second Superceding Indictment.

More specifically, the government explained that it intended to present Shields' testimony concerning the murders of the Bennett brothers and Grasso as evidence of that alleged Enterprise. Mar. 27, 1996 Gov. Consolidated Resp. at 7–8. The government did not, however, disclose that the grand jury was used after the return of the Second Superceding Indictment to ob-

tain Shields' testimony. *Id.* Nor did the government suggest that it intended to seek a Third Superceding Indictment that would allege the murders as racketeering acts.

The Government's Consolidated Response also described Daddieco and Ciulla as witnesses who would testify concerning the existence of the Enterprise alleged in the Second Superceding Indictment. *Id.* at 8–10, 12–13. Once again, however, the government did not disclose that information provided by Daddieco and Ciulla had been presented to the grand jury following the return of the Second Superceding Indictment. *Id.* Nor did the government suggest that it was planning to use that information to obtain a Third Superceding Indictment that would add the alleged race-fix scheme as a racketeering act. *Id.*

The grand jury subsequently heard testimony concerning the race-fix scheme from three additional witnesses. "John Doe 1" testified on April 2, 1996. Anthony Rais, who had previously testified before the return of the Second Superceding Indictment, provided evidence to the grand jury on April 16, 1996. "John Doe 3" testified on May 7 and 21, 1996. Rais mentioned that he had seen Flemmi at Marshall Motors, a location in Somerville, Massachusetts where other defendants spent time. Apr. 16, 1996 Tr. (Under Seal) at 10. None of the other witnesses testified about Flemmi at all. *See* Apr. 2, 1996 Tr. (Under Seal); May 7, 1996 Tr. (Under Seal); May 21, 1996 Tr. (Under Seal).

By April 25, 1996, the defendants had discerned that the government was continuing to use the grand jury to investigate more than possible money laundering charges against Flemmi and Bulger. *See* Apr. 25, 1996 Tr. at 84–85; Apr. 25, 1996 Order ¶ 3. They expressed their intention to file a motion to address alleged abuse of the grand jury. *Id.* The court ordered them to do so by May 8, 1996, and directed the government to respond by May 24, 1996. Apr. 25, 1996 Order ¶ 3.

On May 8, 1996, the defendants filed their Motion for Appropriate Relief from Grand Jury Abuse. The motion referred expressly to the recent grand jury testimony of Rais and Edward O'Brien concerning the race-fix scheme. It alleged that the dominant purpose of calling those witnesses was to strengthen the pending Second Superceding Indictment because the government previously had represented that it intended to go to trial on the Second Superceding Indictment and to offer evidence of the race-fix scheme to prove the existence and nature of the alleged Enterprise. The defendants requested a range of relief, including an injunction concerning the continuing grand jury investigation and suppression of all evidence obtained directly and derivatively from the alleged abuse of the grand jury process.

The defendants' motion for redress regarding grand jury abuse did not mention Shields or the other evidence that the grand jury had been used to obtain concerning the murders of the Bennett brothers and Grasso because the defendants did not then know about this aspect of the grand jury's continuing investigation. It was, however, evident to the government that the defendants would have a far more formidable claim of grand jury abuse if they knew that Shields' and John Doe 2's testimony had been obtained after the return of the Second Superceding Indictment by using the grand jury's unique power to cause testimony to be compelled and immunized. It was also clear that the government would have a more colorable—although not necessarily successful—defense to the foreseeable claim of grand jury abuse concerning the murders of the Bennett brothers and Grasso if those events were alleged as racketeering acts.

In addition, in view of the court's comments on January 19, 1996, it was apparent to the government that if evidence of the murders of the Bennett brothers and Grasso were offered at trial only as addi-

tional proof of the alleged Enterprise, there would be a significant risk that it would be excluded by operation of Federal Rule of Evidence 403, if not Federal Rule of Evidence 404(b). *See* January 19, 1996 Tr. at 38–41. If those murders became racketeering acts, however, the prospect of having evidence concerning them admitted to prove the existence and nature of the alleged Enterprise, as well as the particular RICO predicates, would be improved. *See, e.g., United States v. King,* 827 F.2d 864, 867 (1st Cir.1987) (after refusing to permit government to restore dismissed racketeering acts alleging murder, court properly excluded evidence of those crimes under Fed.R.Evid. 403).

On May 21, 1996, the government employed the grand jury to address the foreseeable claims of grand jury abuse concerning Shields and John Doe 2 and foreseeable objections to the introduction of their testimony to prove only the alleged Enterprise by obtaining what it characterized as a "bifurcated" Third Superceding Indictment. *See Salemme,* 91 F.Supp.2d at 306; Jan. 9, 1997 Tr. at 8–9. Specifically, the government caused the grand jury to return two Superceding Indictments, each of which it captioned as Cr. No. 94–10287, the number of the original *DeLuca* case.

In the Third Superceding Indictment ("3SI") charging Flemmi and others, John Martorano was not named as a defendant, but the indictment remained replete with references to John Martorano's criminal activity. The alleged Enterprise was unaltered. The Third Superceding Indictment continued to allege that the Enterprise "was engaged in various criminal activities, consisting of acts involving murder, gambling and extortion," as well as related crimes. 3SI ¶ 1(k). Flemmi, Salemme, DeLuca, James Martorano, and Bulger remained codefendants. No counts alleging

new substantive crimes were added.[7] All thirty-two of the Racketeering Acts alleged in the Second Superceding Indictment concerning Flemmi, Salemme, DeLuca, James Martorano, and Bulger were reasserted.

The Third Superceding Indictment, like the Second, alleged that Flemmi participated in the Enterprise by, among other things, engaging in sixteen acts of extortion and the attempted murder of Fitzgerald. *Compare* 3SI, ¶ 24, RA 1; ¶ 25, RA 2; ¶ 29, RA 6; ¶ 30, RA 7; ¶ 31, RA 8; ¶ 32, RA 9; ¶ 33, RA 10; ¶ 34, RA 11; ¶ 35, RA 12; ¶ 38, RA 15; ¶ 40, RA 17; ¶ 41, RA 18; ¶ 43, RAs 20A & 20B; ¶ 58, RA 35; ¶ 59, RA 36; ¶ 60, RA 37; ¶ 61, RA 38 *with* 2SI, ¶ 23, RA 1; ¶ 27, RA 5; ¶ 28, RA 6; ¶ 29, RA 7; ¶ 30, RA 8; ¶ 31, RA 9; ¶ 32, RA 10; ¶ 33, RA 11; ¶ 36, RA 14; ¶ 38, RA 16; ¶ 39, RA 17; ¶ 42, RAs 20A & 20B; ¶ 51, RA 29; ¶ 55, RA 33; ¶ 56, RA 34; ¶ 57, RA 35; ¶ 58, RA 36.

The Third Superceding Indictment also alleged for the first time that the 1967 murders of the Bennett brothers and Grasso were Racketeering Acts of Flemmi and Salemme. 3SI, ¶¶ 44–47, RAs 21–24. It also charged for the first time that from 1973 to 1975, Flemmi, DeLuca and Bulger had engaged in the race-fix scheme as a Racketeering Act on behalf of the amalgam of the LCN and Winter Hill Gang that the Enterprise allegedly constituted. 3SI, ¶ 26, RA 3. As described in § IV, *infra,* the Racketeering Acts added for the first time in the Third Superceding Indictment did not result in a new and distinct pattern of racketeering activity by Flemmi being alleged and, therefore, neither the RICO nor the RICO conspiracy offenses charged were different from the corresponding crimes alleged in the Second Superceding Indictment.

The "bifurcated" Superceding Indictment concerning John Martorano charged

---

7. In response to a motion to dismiss by Flemmi, the Third Superceding Indictment split the charge that Flemmi illegally tampered with two grand jury witnesses, James Katz and Howard Levenson, into two separate Racketeering Acts (¶ 51, RAs 28A & 28B) and two corresponding substantive counts (Counts 28 and 29).

him with engaging in the race-fix scheme as a substantive crime, Count 3, and as a Racketeering Act on behalf of the Enterprise alleged in the Second Superceding Indictment.[8] *See United States v. Martorano*, 97–10069–MLW.[9] It also charged Martorano with conspiring with Flemmi and his other former codefendants to extort money from bookmakers and drug dealers, as well as other offenses.

The court concludes that after the return of the Second Superceding Indictment the government used the grand jury to compel the otherwise unavailable testimony of Shields and John Doe 2 solely to strengthen the RICO and RICO conspiracy charges in the Second Superceding Indictment. As described previously, from the outset of the RICO charges in the First Superceding Indictment it was alleged that the Enterprise was engaged in murder as well as extortion. The government at all times intended to offer evidence concerning the murders of the Bennett brothers and Grasso to prove that contention. *See* Mar. 27, 1996 Gov. Consolidated Resp. at 7–9. By May 1996, the government recognized that Flemmi and his codefendants would eventually discover that the grand jury had been used to acquire the testimony of Shields and John Doe 2. The government obtained the Third Superceding Indictment shortly before it was required to respond to the defendants' May 8, 1996 motion concerning grand jury abuse. The government drafted the Third Superceding indictment to allege those murders as Racketeering Acts in order to strengthen its opposition to the inevitable grand jury abuse motion concerning Shields and John Doe 2, and to enhance its prospects of having their testimony admitted at trial.

With regard to the Racketeering Act concerning the race-fix scheme, however, the court finds that the government was motivated primarily by a desire to charge John Martorano again with the crime Judge Lindsay had dismissed without prejudice. The evidence concerning Flemmi's involvement in the race-fix scheme which was received by the grand jury after the return of the Second Superceding Indictment was obtained in connection with the investigation of John Martorano. No witness was called primarily or exclusively to testify concerning Flemmi. Although the investigation of Flemmi's role and the addition of the race-fix scheme as a Racketeering Act had the effect of strengthening the case against Flemmi on the existing charges, this was not the government's sole or dominant purpose in pursuing its grand jury investigation of that matter.

On May 24, 1996, three days after the return of the Third Superceding Indictment, the government filed its Opposition to the Defendants' Motion for Appropriate Relief Resulting from Grand Jury Abuse ("May 24, 1996 Gov. Opp'n"). In that memorandum, the government asserted that "the grand jury [had] used its process to investigate uncharged crimes." May 24, 1996 Gov. Opp'n at 1. The government argued that "[s]everal of these crimes are charged in the Third Superceding Indictment." *Id.* at 1–2. It characterized the "new crimes" as being the murders of the Bennett brothers and Grasso, and the race-fix scheme, which had been added as Racketeering Acts—but not substantive counts—in the charges against Flemmi. *Id.* at 2. The government did not claim that the RICO or RICO conspiracy charges in the Third Superceding Indictment were "new crimes" distinct from the RICO and RICO conspiracy charges in the First and Second Superceding Indictments. *See id.* at 1–5.

---

8. This is a different Enterprise than the Enterprise alleged and proved in the *Winter* case from which Martorano was a fugitive. *Compare Winter*, 663 F.2d 1120, *with* Martorano indictment, *United States v. Martorano*, Cr. No. 97–10009–MLW.

9. The court deemed the "bifurcated" charges against John Martorano to be a new, separate indictment and had it assigned a new number.

On May 24, 1996, the government also filed an affidavit relating to its memorandum *ex parte* and under seal. In it the government sought to explain why it had obtained a Third Superceding Indictment rather than go to trial on the Second Superceding Indictment as it had represented on September 15, 1995 it intended to do. *See* May 24, 1996 Aff. The government stated that it utilized the grand jury to continue to investigate "criminal activities" that there was "insufficient evidence to charge in the Second Superceding Indictment." *Id.* at ¶ 3. Those "criminal activities" included several murders. *Id.* at ¶ 4.

■ With regard to the murders, the government represented that "the cooperation of Hugh Shields ... caused unanticipated grand jury activity" after September 15, 1995. *Id.* at ¶ 11. The government did not reveal that Shields had not provided information voluntarily or that the grand jury had been used to compel his testimony. *Id.* Similarly, while the government stated that "[t]he cooperation of Shields led to the presentation of additional evidence regarding the murders of the three Bennett brothers as well as ... Grasso," it did not disclose that the grand jury had been used to compel the otherwise unavailable testimony of John Doe 2. *Id.*[10]

After extensive arguments in June 1996 concerning alleged defects in the Third Superceding Indictment, the government on July 2, 1996 obtained a Fourth Superceding Indictment. The new indictment addressed those alleged defects, but made no changes that are material to the analysis of Flemmi's claim of grand jury abuse concerning the addition to the Third Superceding Indictment of the Racketeering Acts relating to the race-fix scheme, and the murders of the Bennett brothers and Grasso.

Nevertheless, on August 5, 1996, the defendants amplified their motion and memorandum concerning grand jury abuse. *See* Aug. 5, 1996 Defs.' Mot. to Dismiss Indictment Based on Grand Jury Abuse and Preindictment Delay. In its August 22, 1996 response the government for the first time contended that the new Racketeering Acts in the Third Superceding Indictment "essentially resulted in a new and different RICO charge against the defendants." Aug. 22, 1996 Gov. Opp'n to Defs.' Mot. to Dismiss Indictment Based on Grand Jury Abuse and Preindictment Delay at 7. The government, however, addressed only the witnesses the defendants had discovered had been called before the

---

10. Grand Jury proceedings are conducted *ex parte*, by the government, and are secret. *See* Fed. R. Cr. P. 6. Defendants may not obtain grand jury transcripts prior to trial unless they demonstrate a particularized need for them. *United States v. Procter & Gamble,* 356 U.S. 677, 683, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958). *See also Douglas Oil Co. of California v. Petrol Stops, Northwest,* 441 U.S. 211, 221, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). Respecting these principles, the court granted the government's request to file its affidavit concerning the motion alleging abuse of the grand jury *ex parte* and under seal.

As the Court of Appeals for the First Circuit has written:

Attorneys are officers of the court and judges must rely on them in a number of ways. In the usual circumstance, the presence of opposing counsel creates a built-in system of checks and balances which aids the judge in defining problem areas. *Where counsel appears ex parte, however, the customary checks and balances do not pertain— and the court is entitled to expect an even greater degree of candor from unopposed counsel than in the typical adversary setting.* Maine Audubon Soc'y v. Purslow, 907 F.2d 265, 268 (1st Cir.1990) (emphasis added).

The government failed to satisfy this duty of candor with regard to the pending matter. Its reference to the "cooperation" of Shields was misleading. The government should have disclosed voluntarily on May 24, 1996 that the grand jury had to be employed to compel Shields' otherwise unavailable testimony. As discussed *infra,* this fact emerged only on September 16, 1995, when the court questioned the government in an *ex parte* proceeding. *See* Sept. 16, 1996 Tr. at 3–4, 15–16. As also described *infra,* the government did not disclose on its own initiative additional relevant facts.

grand jury. *Id.* at 3–4. It still did not disclose that Shields had been immunized and compelled to testify or the existence of John Doe 2. *Id.*

In an *ex parte* conference on September 16, 1996, the court inquired and was told that Shields had been compelled to testify. Sept. 16, 1996 Tr. at 3–4. The court expressed the tentative view that his testimony was likely to be excluded at trial. *Id.* at 15–16.

When the court asked if other witnesses had testified before the grand jury concerning the murders of the Bennett brothers or Grasso, John Doe 2 was not mentioned, although he was similarly situated to Shields. *Id.* at 3–4, 15–16. Rather, John Doe 2 was revealed in response to the court's instruction that the government supplement its May 24, 1996 affidavit. *Id.* at 15–16; Gov.'s Sept. 19, 1996 *In Camera, Ex Parte* Submission Regarding Pending Grand Jury Abuse Issues ¶ 3 (Under Seal).

## IV.  ANALYSIS

### A.  The Murders of the Bennett Brothers and Grasso

The government abused the grand jury in using it to compel the testimony of Shields and John Doe 2 after the return of the Second Superceding Indictment. The continued use of the grand jury to investigate the race-fix scheme, however, was permissible.

With regard to Shields and John Doe 2, the grand jury was employed to obtain and freeze testimony in order to strengthen the RICO and RICO conspiracy charges in the Second Superceding Indictment. The government had several, closely related primary purposes in compelling that testimony. First, the government wanted to

obtain the testimony of Shields and John Doe 2 in the hope of discovering otherwise unavailable evidence that Flemmi and Salemme participated in the murders of the Bennett brothers and Grasso in order to demonstrate that the Enterprise, as alleged from the outset of the RICO charges, engaged in murder. Second, it wanted to increase the prospect of having that evidence admitted at trial by adding the murders as Racketeering Acts.[11] However, because the RICO and RICO conspiracy charges in the Third Superceding Indictment are, as explained below, the same crimes that were alleged previously, the use of the grand jury for these purposes was improper.

In this case, the government believed that it was permissible to continue to use the federal grand jury to investigate any "criminal activity" by Flemmi if it had not been charged previously as a substantive count or specific racketeering act. May 23, 2000 Tr. at 71–74. This, however, was incorrect.

As explained in § II, *supra*, after a defendant has been indicted on particular charges, a federal grand jury may investigate him only for "other *crimes.*" *Diamante,* 814 F.2d at 70 (emphasis added). Specifically, as the government now concedes, a federal grand jury may properly investigate only potential additional, prosecutable, federal offenses committed by an individual who has been indicted or investigate related crimes committed by others. Sept. 17, 1996 Tr. at 59–60; May 23, 2000 Tr. at 23. *See also Gibbons,* 607 F.2d at 1328; *LaPorta,* 46 F.3d at 161; *Leung,* 40 F.3d at 581.

As described earlier, the murders of the Bennett brothers and Grasso in 1967 did

---

11.  As discussed *infra,* the Racketeering Acts alleging that Flemmi participated in the murders of the Bennett brothers and Grasso had the effect of raising the penalty for the RICO charges against him from twenty years to life in prison. *See* 18 U.S.C. § 1963(a); *United States v. Carrozza,* 4 F.3d 70, 81 (1st Cir. 1993). However, the government did not in

any of its many written submissions claim that it was motivated to use the grand jury to develop evidence in order to increase the maximum sentence Flemmi would face. The government, at the May 23, 2000 hearing, mentioned that the murder Racketeering Acts had this effect. May 23, 2000 Tr. at 72.

not themselves constitute federal offenses. Their relevance to the federal grand jury was as potential proof of the Enterprise alleged in the First Superceding Indictment and its successors, and as potential parts of a pattern of racketeering activity that must be proven to obtain a conviction on a RICO charge. The federal offense to be investigated, however, was a violation of the federal RICO statute, 18 U.S.C. § 1961 *et seq.* As the government acknowledges, it could not have properly conducted a federal grand jury investigation of the murders of the Bennett brothers and Grasso except as part of a RICO investigation. Sept. 17, 1996 Tr. at 59.

As described earlier, the grand jury was investigating the murders of the Bennett brothers and Grasso prior to the return of the First Superceding Indictment in an effort to obtain evidence of the Enterprise that ultimately would be alleged and of possible additional racketeering acts. The government had the discretion to postpone seeking an indictment until it had exhausted its investigation of those matters. *See United States v. Lovasco,* 431 U.S. 783, 791, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *United States v. Acevedo,* 842 F.2d 502, 504 (1st Cir.1988); *United States v. Lebron–Gonzalez,* 816 F.2d 823, 831 (1st Cir. 1987). It did not choose to do so.

Rather, the government sought and received in January 1995 an indictment charging Flemmi with RICO and RICO conspiracy offenses. The subsequent use of the federal grand jury to acquire additional evidence that Flemmi violated the RICO statute would have been permissible if it were developing evidence of RICO offenses that were not the same as the RICO offenses charged in the First and Second Superceding Indictments. However, the addition of the Racketeering Acts concerning the race-fix scheme and the murders of the Bennett brothers and Grasso did not result in the Third Superceding Indictment charging RICO and RICO conspiracy offenses that were different from those alleged previously.

■ The government in this case now contends, however, that the RICO and RICO conspiracy counts in the Second and Third Superceding Indictments charge different crimes because of the addition of the race-fix and murder Racketeering Acts. The government argues that the proper test for determining whether the same crimes are alleged is the same elements test of *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The government asserts that:

> Because a conviction for racketeering requires not only proof of all elements of 18 U.S.C. § 1962, but also of the predicate crimes which constitute the pattern of racketeering activity, the elements of the murder, conspiracy to murder, and sports betting charges are different from the elements of the other predicate crimes charged in the Second Superceding Indictment.

Oct. 1, 1996 Gov. Submission Regarding Pending Grand Jury Abuse Issues at 4.

However, *Blockburger* addresses the question whether the same conduct can constitute, and be punished as, two offenses. *See* 284 U.S. at 304, 52 S.Ct. 180. *Blockburger* held there are two offenses if the statutory provisions at issue have different elements and "each provision requires proof of an additional fact which the other does not." *Id.*[12]

---

**12.** As the Court of Appeals for the Eighth Circuit has observed:

> Although the *Blockburger* test is easily recited, it is not so easily applied. Indeed, we note that *courts are split on whether the test is to be applied by looking solely to the statutory elements of the offense, or by going beyond the statute and looking at the underlying facts or averments in the indictment.*

*Compare United States v. Adams,* 1 F.3d 1566, 1574 (11th Cir.1993) ("the *Blockburger* test is to be applied to the statutory elements underlying each indictment, or count, not to the averments that go beyond the statutory elements"), *cert. denied,* 510 U.S. 1198, 114 S.Ct. 1310, 127 L.Ed.2d 660 (1994) *with United States v. Sampol,* 636 F.2d 621, 652 (D.C.Cir.1980) ("the prohibi-

The new charges in the Third Superceding Indictment, however, do not require the government to prove any new statutory elements to secure Flemmi's convictions. Counts 1 and 2 of the Second and Third Superceding Indictments charge a RICO conspiracy in violation of 18 U.S.C. § 1962(d) and a substantive RICO offense in violation of § 1962(c), respectively. The statutory elements of each substantive charge and each conspiracy charge are precisely the same.

Nor do the RICO and RICO conspiracy charges in the Third Superceding Indictment require the government to prove any facts that it would not have had to establish to secure Flemmi's conviction on the corresponding charges in the Second Superceding Indictment. Specifically, in order to secure Flemmi's conviction on the RICO charges of the Third Superceding Indictment, the government is not required to prove that Flemmi participated in the race-fix scheme or any of the murders alleged as Racketeering Acts.

To prove a substantive RICO violation, the government must prove, in essence, that the defendant participated in the affairs of an enterprise through a "pattern of racketeering activity." 18 U.S.C. § 1962(c). A pattern of racketeering activity can be established by proof of only two predicate acts which meet certain requirements. 18 U.S.C. § 1961(5); *United States v. Boylan*, 898 F.2d 230, 249–50 (1st Cir.1990). Thus, the government would have to prove only two of the nineteen Racketeering Acts against Flemmi common to the Second and Third Superceding Indictments to convict him of the substantive RICO charge in each. It need not prove the race-fix or murder Racketeering Acts to secure Flemmi's conviction on Count 2 of the Third Superceding Indictment. Therefore, the alleged murders and race-fix predicate acts are not elements of the substantive RICO offense charged.

With regard to the RICO conspiracy alleged in the Third Superceding Indictment, the government need not even prove that Flemmi committed, or agreed to commit, two predicate acts. *See United States v. Posada–Rios*, 158 F.3d 832, 857 (5th Cir.1998) (citing *Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 139 L.Ed.2d 352 (1997)), *cert. denied*, 526 U.S. 1031, 119 S.Ct. 1280, 143 L.Ed.2d 373 (1999). Rather, to prove the RICO conspiracy charge against Flemmi, the government must only "establish (1) that two or more people agreed to commit a substantive RICO offense and (2) [Flemmi] knew of and agreed to the overall objective of the RICO offense." *Id.* Thus, with regard to RICO conspiracy, the predicate acts Flemmi allegedly committed are not elements of the offense or facts that must be proven.

Indeed, the government's position in this case that the new Racketeering Acts included in the Third Superceding Indictment, particularly those concerning murder, add new elements and cause the RICO charges in that indictment to constitute "new crimes" is completely contrary to the position that the government took in

tion in the Constitution against placing an accused twice in jeopardy 'for the same offense' is directed at the actual 'offense' with which he is charged and not only at the violated statutes"). There is also disagreement on this issue among members of the Supreme Court. *See Dixon*, 509 U.S. at 693–705, 113 S.Ct. at 2855–61 (Scalia, J., joined by Kennedy, J.); *id.* at 712–20, 113 S.Ct. at 2865–69 (Rehnquist, C.J., joined by O'Connor, J., and Thomas, J.); *id.* at 727–28, 113 S.Ct. at 2873–74 (White, J., joined by Stevens, J.); *and id.* at 759–80, 113 S.Ct. at 2890–91 (Souter, J., joined by Stevens, J.).

*United States v. Bennett*, 44 F.3d 1364, 1374 (8th Cir.1995) (emphasis added).

The Court of Appeals for the First Circuit has not spoken directly to this issue. As set forth *infra*, this court believes that in the context of RICO charges it is not sufficient to focus only on the statutory elements of the offense. Thus, the court has analyzed the patterns of racketeering activity concerning Flemmi in the Second and Third Superceding Indictments to determine whether they constitute the same or different "elements."

*King,* 827 F.2d at 866. *King* was also a RICO case. *Id.* at 865. The defendant originally was charged with one murder as part of his alleged pattern of racketeering activity. *Id.* The government successfully moved to delete that predicate act from the indictment to avoid complications with the retrial of the substantive murder charge in state court.

At the federal trial, however, the government attempted to introduce evidence of the murder and argued that:

> the defendant remains charged with the same crimes and that the inclusion or deletion of Predicate Act 26 [alleging murder] would have no impact upon the elements of those crimes, but merely impact upon the proof the government would be allowed to bring on the RICO, RICO conspiracy, and seditious conspiracy charges. The government suggests that, indeed, if Predicate Act 26 had impacted on the elements of the crimes charged in the indictment, the prior deletion of Predicate Act 26, approved by the district court, would have been an improper amendment of the indictment.

*Id.* at 866.

The Court of Appeals for the First Circuit did not reach the merits of this issue, finding that the district court was justified in excluding the proffered evidence pursuant to Federal Rule of Evidence 403. *Id.* at 865. This court finds, however, that the government's position was correct in *King* and is incorrect in the instant case.

If the government were right that *Blockburger*'s focus on the statutory elements of an offense and facts which must be proven provides the sole, proper test for determining whether the RICO charges in the Second and Third Superceding Indictments are the same, the inquiry on that issue would be over. There are, however, possible circumstances in which a superceding indictment would so significantly alter a defendant's alleged pattern of racketeering activity that it would charge him with a new RICO offense. This, however, is not such a case.

■ There do not appear to be any reported cases involving grand jury abuse which address whether successive RICO charges constitute the same or different crimes. This court finds, however, that it is most appropriate to apply the jurisprudence concerning the operation of the Double Jeopardy Clause to successive RICO prosecutions for the purpose of determining whether the grand jury was abused in developing the Third Superceding Indictment in this case.[13] The Double Jeopardy Clause proscribes certain forms of prosecutorial misconduct. It addresses, among other things, the concern that "the government not be given the opportunity ... [to] 'perfect[ ] its evidence.'" *United States v. Dixon,* 509 U.S. 688, 747, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (Souter, J., joined by Stevens, J., concurring in part and dissenting in part) (quoting *Tibbs v. Florida,* 457 U.S. 31, 41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)). This concern is also a foundation of the prohibition on the continued use of the grand jury to obtain additional evidence to strengthen an indicted case. *See Diamante,* 814 F.2d at 70; *Doe,* 455 F.2d at 1273; *Simels,* 767 F.2d at 30; *Thompson,* 944 F.2d at 1337.

As has been explained in analyzing successive RICO charges to determine whether the Double Jeopardy Clause was violated, " 'enterprise' and 'pattern of racketeering activity' are separate elements of § 1962(c), both of which must be proven by the government." *United States v. Ciancaglini,* 858 F.2d 923, 928 (3rd Cir.1988). *See also United States v. Ruggiero,* 754 F.2d 927, 931 (11th Cir. 1985). Accordingly, "RICO includes a separate unit of prosecution for each *dis-*

---

13. The Double Jeopardy Clause of the Constitution states:

> No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb.

U.S. Const. amend V.

*tinct pattern* of racketeering activity." *United States v. Dean,* 647 F.2d 779, 787–88 (8th Cir.1981) (emphasis added). This is, in part, because "Congress [did not intend] that a defendant should be prosecuted only once for an ongoing RICO enterprise when, after being convicted of carrying out the enterprise's activities through one pattern, he allegedly continues to carry them out through a *separate* pattern." *Ciancaglini,* 858 F.2d at 928–29 (emphasis added).

■■■ The courts have recognized, however, that the power to alter the racketeering acts alleged in successive indictments makes "the RICO statute ... susceptible to abuse in the hands of overzealous prosecutors." *Ruggiero,* 754 F.2d at 934 (citing *United States v. Russotti,* 717 F.2d 27, 34 & n. 4 (2d Cir.1983)). Thus, it is important that courts be vigilant in answering the "crucial inquiry" concerning whether the activities alleged in two sets of charges constitute "one 'pattern of racketeering activity' or two *different patterns.*" *Id.* at 932 (emphasis added). Where, as here, the same Enterprise is alleged, unless the *patterns* are truly distinct, rather than substantially the same, the RICO offenses charged are the same, rather than different. *Dean,* 647 F.2d at 787–88; *Ciancaglini,* 858 F.2d at 928.

"A separate inquiry need not be made for both a substantive RICO charge under 18 U.S.C.A. § 1962(c) and a conspiracy RICO charge under 18 U.S.C.A. § 1962(d), if both are based on the same underlying 'pattern of racketeering activity.'" *Ciancaglini,* 858 F.2d at 929. This is such case. Therefore, a unitary analysis is appropriate.

In *Dean,* the seminal case on Double Jeopardy in successive RICO prosecutions, the Court of Appeals for the Eighth Circuit employed the totality of the circumstances test generally applied to criminal

conspiracies to determine if a variation in the alleged pattern of racketeering activity was sufficiently significant to charge a new crime. 647 F.2d at 788. It did so because "a RICO charge, like a conspiracy charge, focuses upon a relation between various elements of criminal activity rather than a single criminal act." *Id.*

In *Dean,* the court identified five factors to be considered in determining whether alleged patterns of racketeering activity are the same or different. *Id.* They are:

(1) the time of the various activities charged as parts of separate patterns; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity which the government seeks to punish under each charge; and (5) the places where the corrupt activity took place under each charge.

*Id.*

This test has been adopted without significant alteration by every other circuit that has dealt with the RICO–RICO Double Jeopardy issue except the Third Circuit. *See Russotti,* 717 F.2d at 33 (2d Cir.); *United States v. Sinito,* 723 F.2d 1250, 1256 (6th Cir.1983) (drawing directly from conspiracy cases); *United States v. Marren,* 890 F.2d 924, 935 (7th Cir.1989); *Ruggiero,* 754 F.2d at 932 (11th Cir.).[14] Some courts have highlighted the fourth factor, the nature and scope of the charged activity, as the "most important factor." *Ruggiero,* 754 F.2d at 933. *See also Russotti,* 717 F.2d at 34; *United States v. Langella,* 804 F.2d 185, 189 (2d Cir.1986).

The Third Circuit has adopted a four-factor totality of the circumstances test for dual RICO cases, specifically disavowing the use of "the statutory offenses charged in the indictments as one of the factors in

---

14. While the Court of Appeals for the First Circuit has not had occasion to employ the totality of the circumstances test in a RICO–RICO case, it has employed the five factors

utilized in *Dean* to analyze Double Jeopardy claims concerning conspiracies generally. *See, e.g., United States v. Gomez–Pabon,* 911 F.2d 847, 860 (1st Cir.1990).

the totality of the circumstances test." *Ciancaglini*, 858 F.2d at 927 (internal quotation marks omitted). The Third Circuit disregards this factor because it believes that giving weight to the statutory offense charged promotes the very problem that led courts away from the same elements test in the dual conspiracy area: prosecutors manipulating charges. *Id.* (citing *Liotard*, 817 F.2d at 1078 n. 7). Otherwise, the Third Circuit's test is identical to that developed by *Dean* and followed in the other circuits.[15]

For present purposes, the court assumes that all five factors should be considered in determining whether the Second and Third Superceding Indictments charge Flemmi with participating in the alleged Enterprise through the same or different patterns of racketeering activity.

With regard to the first factor, the times of the various activities charged as parts of the two patterns are essentially the same. The RICO conspiracy in each indictment is alleged to have begun in 1967 and continued to January 1995. *See* 2SI, ¶ 2; 3SI, ¶ 2. All of the Racketeering Acts alleged for the first time in the Third Superceding Indictment occurred in this period. Edward Bennett was killed in about January 1967. 3SI, ¶ 44. Walter Bennett was murdered in April 1967. 3SI, ¶ 45. The murders of William Bennett and Grasso occurred in December 1967. 3SI, ¶¶ 46–47. This was about a month before the attempted murder of Fitzgerald that was alleged as a Racketeering Act in the Second Superceding Indictment. 2SI, ¶ 42. The race-fix scheme allegedly lasted from December 1973 to November 1975. 3SI, ¶ 26.

With regard to the second factor, there is a complete identity of the individuals allegedly involved in the patterns of racketeering alleged in the Second and Third Superceding Indictments generally, and in Flemmi's personal pattern of racketeering activity particularly. Although John Martorano was charged as a defendant in a separate indictment, the allegations concerning him continued in the Third Superceding Indictment charging Flemmi.

Similarly, the place where the racketeering activity allegedly occurred was not materially altered by the new Racketeering Acts alleged in the Third Superceding Indictment. The murders occurred in Massachusetts, where almost all of the Racketeering Acts alleged earlier were concentrated. The race-fix case mentioned Pennsylvania and New Jersey for the first time, but this is not significant in view of the fact that previously alleged predicates involved activities by various

---

**15.** The government relies in part on *United States v. Orena*, 876 F.Supp. 20, 23 (E.D.N.Y. 1995) in arguing that a *Blockburger* rather than Double Jeopardy analysis should be employed in this case. Oct. 1, 1996 Gov. Submission Regarding Pending Grand Jury Abuse Issues at 3–5. In *Orena*, the district court did not expressly apply the totality of the circumstances test for successive RICO prosecutions that was previously prescribed by the Court of Appeals for the Second Circuit in *Russotti*. *See Russotti*, 717 F.2d at 32–35. In *Russotti*, the Court of Appeals for the Second Circuit emphasized the importance of determining whether "two RICO counts charge two *distinct patterns* of racketeering activity." *Id.* at 33 (emphasis added). In *Orena*, the district court cited *Russotti*, but paraphrased it imprecisely, stating that, "[f]or the subsequent indictment to present a double jeopardy problem both the enterprise and *the activity* alleged in the earlier indictment must be the same as the enterprise and activity alleged in the later indictment." *Orena*, 876 F.Supp. at 23 (citing *Russotti*, 717 F.2d at 33) (emphasis added). In *Orena*, however, there were two distinct *patterns* of racketeering activity alleged. *Id.* In the earlier, dismissed indictment the pattern of racketeering activity was composed exclusively of loansharking, but in the indictment at issue the predicate acts were murders. *Id.* Thus, although the applicable standard was not correctly stated, the requirements of *Russotti* for establishing separate crimes were met because the alleged patterns of racketeering activity were distinct.

Contrary to the government's contention, the district court in *Orena* did not refer to *Blockburger* in its analysis of the successive RICO charges. *Id.* Rather, a *Blockburger* analysis was done to address successive prosecutions on firearms charges. *Id.* at 24.

defendants in Los Angeles, Las Vegas, and New York. 2SI, ¶¶ 43, 47.

Perhaps more importantly, the fundamental nature and the scope of racketeering activity for which the government sought to have Flemmi punished did not change between the Second and Third Superceding Indictments. As described earlier, from the outset of the RICO charges it was alleged that the Enterprise "engaged in various criminal activities, consisting of acts involving murder and extortion" as well as related crimes. *See* 1SI, ¶ 1(j); 2SI, ¶ 1(k); 3SI, ¶ 1(k); 4SI, ¶ 1(k). Similarly, it was at all times alleged that the coconspirators regularly used violence and the threat of violence to accomplish their illegal purposes. 1SI, ¶ 3; 2SI, ¶ 3; 3SI, ¶ 3; 4SI, ¶ 3.

The essence of Flemmi's pattern of racketeering activity in the Second Superceding Indictment was that he participated in the affairs of the Enterprise by committing crimes of violence, including sixteen extortions,[16] in violation of 18 U.S.C. § 1951 and M.G.L. c. 265, § 25, and attempted murder in violation of M.G.L. c. 265, § 18. The Third Superceding Indictment continued to allege that Flemmi's pattern of racketeering activity consisted primarily of the same sixteen acts of extortion. It added the race-fix scheme, another gambling-related offense. It also added the four murder Racketeering Acts, which alleged violations of the Massachusetts statute prohibiting murder, M.G.L. c. 265, § 1. These additional Racketeering Acts reinforced rather than altered the essential nature of Flemmi's alleged pattern of racketeering activity that was charged previously.

The four murder Racketeering Acts did not alter the activity that the government sought to punish in this case. As the government has acknowledged, it could and would have attempted to have Flemmi

punished for having murdered the Bennett brothers and Grasso if he were convicted on the Second Superceding Indictment, which did not allege those crimes as Racketeering Acts. Gov.'s Submission in Resp. to Court's June 15, 2000 Order at 1–3.

As the Court of Appeals for the First Circuit has held, a defendant convicted of RICO or RICO conspiracy may, under the United States Sentencing Guidelines, be punished for all of his "underlying racketeering activity," even if that "'conduct [was] not formally charged or [was] not an element of the offense of conviction.'" *Carrozza*, 4 F.3d at 77 (quoting U.S.S.G. § 2E1.1). "'[U]nderlying racketeering activity,' . . . means simply any act, whether or not charged against [a] defendant personally, that qualifies as a RICO predicate act." *Id.* Thus, if the government succeeded in convicting Flemmi on the RICO charges of the Second Superceding Indictment, it could and would have sought to enhance his punishment by proving at sentencing that he had participated in the Enterprise by committing the murders of the Bennett brothers and Grasso as part of the same pattern of racketeering activity that it had established in securing his conviction. *Id.;* Gov.'s Submission in Resp. to Court's June 15, 2000 Order at 1–3.

The addition of the murder Racketeering Acts to the Third Superceding Indictment did raise the statutory maximum penalty for the RICO offenses from twenty years to life in prison. *See* 18 U.S.C. § 1963(a); *Carrozza*, 4 F.3d at 81. As the government has stated, however, "[a]lthough defendant's sentence [on each count] would be limited to the statutory maximum of twenty years, conviction on multiple counts could result in consecutive sentences that essentially amount to a life sentence." Gov. Submission in Resp. to Court's June 15, 2000 Order at 2, n. 2.[17]

---

**16.** Extortion is a crime of violence. United States Sentencing Guidelines § 4B1.2(a)(2) & Application Note 1 ("'[c]rime of violence in-

cludes . . . extortion'") (1999); *United States v. Sawyer,* 144 F.3d 191, 195 (1st Cir.1998).

**17.** Neither the Court of Appeals for the First Circuit nor this court has addressed the issue

Because the alleged Enterprise was unaltered and Flemmi's alleged pattern of racketeering activity was not materially changed, however, the addition of the murder Racketeering Acts means only that the statute provides higher possible penalties for the same RICO offense that previously had been charged. As described earlier, the Third Superceding Indictment does not require the government to prove any additional elements or facts. It merely provides for a higher possible penalty for each RICO count if the government proves Flemmi participated in the affairs of the Enterprise by committing murder.

Contrary to the government's contention, the decision of the Court of Appeals for the Second Circuit in *United States v. Reiter*, 897 F.2d 639, 644 (2d Cir.1990), is consistent with this analysis. In *Reiter*, there was no question of grand jury abuse because the continuing investigation focused on broadening the RICO conspiracy to include suppliers as well as distributors of heroin, among other things. 897 F.2d at 644. Rather, the court was confronted with the question whether a defendant, Rollack, could be tried *in absentia* on a twelfth superceding indictment which was different in many ways than the fourth superceding indictment on which he had been arraigned before fleeing. *Id.*

In *Reiter*, the fourth superceding indictment charged Rollack with: (1) distribution of heroin in Manhattan in July 1983; (2) conspiracy to distribute heroin based on the substantive charge; (3) a substantive RICO violation based on the first two heroin distribution and conspiracy charges; and (4) a RICO conspiracy charge based on the same predicate acts as the substantive RICO charge. *Id.* at 641. The

twelfth superceding indictment alleged the same criminal activity as the fourth, but it also added: (1) suppliers, which broadened the enterprise; (2) charges against Rollack for four new RICO predicate acts including murder, conspiracy to murder, and two separate acts of possession with intent to distribute ("PWID") heroin in the Bronx; (3) two new substantive crimes (the PWID charges added as RICO predicate acts); and (4) two new overt acts underlying the non-RICO conspiracy to distribute heroin in Manhattan in July 1983 (the same PWID charges listed above). *Id.* at 642. In these circumstances, the Second Circuit understandably found that the crimes with which Rollack was charged in the two indictments were not the same. *Id.* at 644.

The instant case contrasts strikingly with *Reiter*. Flemmi was charged with no additional substantive offense in the Third Superceding Indictment. Moreover, in this case, as in *United States v. Marable*, 578 F.2d 151, 156 (5th Cir.1978), "when the events of the [Third Superceding Indictment] are overlaid with those of the [Second] there emerges not two distinct patterns of activity but a single design with the events most important in each [charge] appearing at crucial and common junctures." Thus, the patterns of Flemmi's racketeering activity alleged in the Second and Third Superceding Indictments are not "distinct" or "separate." *Dean*, 647 F.2d at 787–88; *Ciancaglini*, 858 F.2d at 928–29.

To summarize, the RICO offenses charged in the Second and Third Superceding Indictment are the same. *Id.* If Flemmi had been tried and acquitted on the RICO charges in the Second Superced-

---

of whether sentencing a defendant to life in prison based on uncharged murders would violate his right to Due Process. *See Carrozza*, 4 F.3d at 81, n. 9.; *United States v. Patriarca*, 912 F.Supp. 596, 609 (D.Mass.1995). While interesting, this issue may have little practical significance for Flemmi. He is more than 60 years old. He faces the potential of a long sentence if convicted on the charges of the Second Superceding Indict-

ment in this case. He is also now a defendant in two other pending cases. *United States v. Connolly*, Cr. No. 99–10428–JLT; *United States v. Flemmi*, Cr. No. 97–10060–REK. In addition, the government has indicated that investigation of Flemmi's conduct is continuing and he may be indicted for additional offenses, including crimes involving murder. *See* Feb. 24, 2000 Memorandum and Order at 5–6, n. 2; June 28, 2000 Tr. at 26–27.

ing Indictment, the Double Jeopardy Clause would bar his prosecution on the RICO allegations of the Third Superceding Indictment because they so substantially overlap with the RICO allegations of the Second. For essentially the same reason, it was impermissible for the government to use the grand jury to compel the testimony of Shields and John Doe 2 to obtain evidence of Flemmi's alleged involvement in the murders of the Bennett brothers and Grasso, because the addition of those events as Racketeering Acts do not render the RICO charges in the Third Superceding Indictment new and different from those alleged previously but, rather, impermissibly strengthened already-existing charges.[18]

### B. *The Race–Fix Scheme*

The analysis concerning the race-fix scheme is simpler. The government's primary motive in calling each of the witnesses who testified about the race-fix scheme after the return of the Second Superceding Indictment was to reindict John Martorano on substantive charges comparable to those that had been dismissed without prejudice by Judge Lindsay. John Martorano was charged substantively with a conspiracy to engage in sports bribery concerning the race-fix scheme in violation of 18 U.S.C. § 224 in Count 3 of Indictment No. 97–10009–MLW.

But for the government's interest in John Martorano, the grand jury would not have heard the evidence concerning Flemmi that permitted it to charge for the first time in the Third Superceding Indictment that he participated in the affairs of the alleged Enterprise by engaging in the race-fix scheme. This evidence strengthened the government's proof of the Enterprise previously alleged, and provided another act that, if proven, would contribute to establishing the pattern of racketeering activity previously alleged. It was, however, acquired incidental to the investigation of John Martorano. Thus, the use of the grand jury to obtain it was permissible. *See Gibbons*, 607 F.2d at 1328; *LaPorta*, 46 F.3d at 161; *Leung*, 40 F.3d at 581.

### V. *REMEDY*

■ Because the grand jury was improperly used to compel and freeze the testimony of Shields and John Doe 2, the court will not permit the use of that evidence at trial. *See Doe*, 455 F.2d at 1276; *In Re Grand Jury Proceedings*, 30 F.3d 126 (Table), 1994 WL 390138 *2 (1st Cir. 1994) (unpublished); *Simels*, 767 F.2d at 30; *Kovaleski*, 406 F.Supp. at 271.

18. The instant case is distinguishable from the decisions finding that the grand jury was not abused on which the government relies. In each of those cases, including the following, the witnesses *at issue were called before* the grand jury to testify about additional substantive offenses committed by the indicted defendant or uncharged crimes committed by other individuals.

For example, in *LaPorta*, 46 F.3d at 154–55, 161, the legitimate purpose found to exist was the obtaining of a superceding indictment that contained allegations of violations of federal law not previously charged. In *Sasso*, 59 F.3d at 351–52, the grand jury was investigating persons not previously charged. In *Leung*, 40 F.3d at 581–82, the post-indictment subpoena was to obtain bank records as part of an investigation of possible money laundering not previously charged. In *Gibbons*, 607 F.2d at 1328–29, the post-indictment testimony was designed to identify and charge additional coconspirators. In *In re Grand Jury Proceedings*, 632 F.2d 1033, 1040–41 (3d Cir. 1980), the subpoenas at issue were intended to aid in the investigation of persons other than the already indicted defendant.

Moreover, contrary to the government's contention, the Sixth Circuit's unpublished opinion *United States v. Austin*, 202 F.3d 270 (Table), 2000 WL 32017 *7 (6th Cir.) (unpublished), *cert. denied* —— U.S. ——, 120 S.Ct. 1984, 146 L.Ed.2d 812 (2000), does not stand for the proposition that the addition of overt acts in a conspiracy case was sufficient to establish that the grand jury was not used solely or predominantly to prepare a pending indictment. In *Austin*, the superceding indictment also added two new defendants and four new counts, one of which charged an already indicted defendant with a new offense and three of which charged the newly added codefendants. *Id.*

The government also will not be permitted to use at trial any evidence derived from the testimony of Shields and/or John Doe 2. *See Doe,* 455 F.2d at 1276. As the Court of Appeals for the First Circuit has recognized, it is often difficult to identify such "fruits" of improper conduct. *Id.* This observation is valid in this case in its present posture. It is not possible on the present record to determine whether any of the evidence the government wishes to introduce at trial should be deemed to be derived from the testimony of Shields and/or John Doe 2, and excluded.

For example, only court ordered disclosures since the May 23, 2000 hearing have begun to bring into focus the competing arguments concerning Daddieco's testimony. As described in § III, *supra,* Daddieco has been cooperating with the government for many years and in 1969 provided some information concerning the murders of the Bennett brothers. This information was obtained long before the government used the grand jury to acquire otherwise unavailable evidence from Shields and John Doe 2. Daddieco was not questioned about the murders, however, when he testified to the grand jury prior to the return of the First Superceding Indictment. Shields' testimony led the government to interview Daddieco concerning the murders of the Bennett brothers and Grasso, and to present to the grand jury, through an FBI agent, a summary of the information Daddieco provided.

The parties have not had an opportunity to argue the implications of these facts. The government has, however, expressed its intention to appeal immediately any adverse ruling concerning the use of the grand jury with regard to Shields and John Doe 2. In connection with other motions to suppress that have been granted, the government successfully urged the court not to address questions of derivative use until its appeal had been decided. The court will adopt the same approach here. Any issues of derivative use will be decided if the result of the government's appeal of this decision, and other matters, makes it necessary and appropriate to do so.

The court also is not granting Flemmi's request to dismiss this case based upon the abuse of the grand jury process that has been proven. The actual unfair prejudice to Flemmi from the abuse of the grand jury to compel and freeze the testimony of Shields and John Doe 2 can be remedied by the exclusion at trial of their testimony and any evidence derived from it. Thus, dismissal of this case for this error alone is not necessary or appropriate. *See Bank of Nova Scotia v. United States,* 487 U.S. 250, 252, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988); *United States v. Santana,* 6 F.3d 1, 11 (1st Cir. 1993).

Rather, the court is ordering a remedy that is intended to put the parties in the position they would have been in if the grand jury had not been used improperly. This is the usual remedy when it has been proven prior to trial that the government has obtained evidence illegally. *See, e.g., United States v. Byram,* 145 F.3d 405, 409 (1st Cir.1998) (suppression of coerced confession pursuant to Fifth Amendment); *Weeks v. United States,* 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (suppression of evidence pursuant to Fourth Amendment), *overruled on other grounds, Elkins v. United States,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). *See generally* 8 Geo. L.J. 1043–44 (2000). Nevertheless, the court recognizes that this decision may appear to let Flemmi "get away with murder." Therefore, while perhaps not necessary, two observations seem appropriate.

█ First, although Shields and John Doe 2 will be excluded from testifying at trial, the evidence they provided may be admissible at sentencing to prove that Flemmi should be punished for the murders of the Bennett brothers and Grasso if he is convicted of the RICO charges based upon properly admissible evidence. As de-

scribed earlier, when a RICO offense is proven, a defendant may be punished even for uncharged acts which constitute part of his "underlying racketeering activity." *See Carrozza,* 4 F.3d at 81. He also may be sentenced for certain conduct that was charged, but not proven at trial. *See United States v. Watts,* 519 U.S. 148, 153–54, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam); *United States v. Alicea,* 205 F.3d 480, 485–86 (1st Cir.2000).

In addition, there are circumstances in which evidence excluded at trial, such as illegally seized drugs or weapons, has been deemed admissible at sentencing. *See, e.g., United States v. Kim,* 25 F.3d 1426, 1434–35 (9th Cir.1994) (drugs); *United States v. Montoya–Ortiz,* 7 F.3d 1171, 1181 (5th Cir.1993) (weapons); *United States v. Tejada,* 956 F.2d 1256, 1262–63 (2d Cir. 1992) (drugs and weapons); *United States v. Lynch,* 934 F.2d 1226, 1234 (11th Cir. 1991) (weapons); *United States v. McCrory,* 930 F.2d 63, 68 (D.C.Cir.1991) (drugs); *United States v. Torres,* 926 F.2d 321, 325 (3rd Cir.1991) (drugs). The government already has expressed its intention to attempt to use at sentencing the evidence provided by Shields and John Doe 2 concerning the murders if Flemmi is convicted. Gov.'s Submission in Resp. to June 15, 2000 Order at 2–3. While it is premature to address the merits of the matter, it should be recognized that the exclusion of their testimony at trial does not necessarily mean that they will be prohibited from testifying at a sentencing hearing if Flemmi is fairly convicted.

Second, and more significantly, it is the duty of the court to apply the well established law to the facts as it has found them, and to provide Flemmi, who must be presumed innocent, the remedy for the violations of his rights to which any other defendant would be entitled. As the Court of Appeals for the Second Circuit has recognized, the rule barring use of the grand jury to strengthen an indicted case "is difficult, if not impossible, to enforce." *Simels,* 767 F.2d at 30 (internal quotation

marks omitted). However, as that court held, it is important to enforce that rule where, as here, such violations have been demonstrated. *Id.*

If events relating to this case teach anything, it is that it is dangerous to permit officials entrusted to enforce the law to develop the belief that their own misconduct will not have consequences. *See Salemme,* 91 F.Supp.2d at 141–315. Among other things, courts are constituted to hold government officials to the limits of their lawful power and, in the process, to remind them that the cases they seek to prove will be complicated, if not fatally compromised, if they are not careful and correct in recognizing those limits themselves. That is what this court has sought to do in this case generally and with regard to the instant motion particularly.

## VI. *ORDER*

In view of the foregoing, Flemmi's Motion for Appropriate Relief from Grand Jury Abuse is hereby ALLOWED in part and DENIED in part, and it is hereby ORDERED that:

1. Flemmi's request that this case be dismissed based solely on the proven abuse of the grand jury is DENIED.

2. Flemmi's request for the exclusion at his trial of the testimony of the witnesses who testified before the grand jury after the return of the Second Superceding Indictment concerning the race-fix scheme that was charged as Racketeering Act 3 in the Third Superceding Indictment is DENIED.

3. Flemmi's request for the exclusion at his trial of the testimony of Hugh Shields and John Doe 2, and any evidence derived from the information that they provided the grand jury after the return of the Second Superceding Indictment, is ALLOWED.